John B. **ANDERSON**, Independents for Anderson Party of North Carolina, Phillip A. Diehl, Gerald Eisenstat, Appellees,

v.

R. Kenneth **BABB**, Sidney Barnwell, Shirley M. Herring, Ruth T. Samashko, John L. Stickley, Alex K. Brock, Appellants.

No. 80–1590.

United States Court of Appeals, Fourth Circuit.

Argued Sept. 8, 1980.

Decided Sept. 19, 1980.

Walter E. Dellinger, School of Law, Duke University, Durham, N. C. (James Wallace, Jr., Deputy Atty. Gen. for Legal Affairs, North Carolina Dept. of Justice, Raleigh, N. C., on brief), for appellants.

Herbert L. Hyde, Asheville, N. C., David F. Kirby, Kirby & Wallace, Ronald D. Eastman, Cadwalader, Wickersham & Taft, Washington, D. C., on brief, for intervenors.

George T. Frampton, Jr., Washington, D. C. (Mitchell Rogovin, Vicki C. Jackson, Ellen M. Semonoff, Rogovin, Stern & Huge, Washington, D. C., Jonathan Harkavy, Smith, Patterson, Follin, Curtis, James & Harkavy, Greensboro, N. C., on brief), for appellees.

Before HAYNSWORTH, Chief Judge, WINTER and PHILLIPS, Circuit Judges.

## PER CURIAM:

On this appeal the Democratic National Committee (DNC) as an intervening defendant [1] challenges the district court's determination that the plaintiff John B. Anderson (Anderson) "did not participate in the presidential primary election in North Carolina" within the meaning of N.C.Gen. Stat. § 163–213.6, and that he is, therefore, entitled to have his name placed on the November 4, 1980 general election ballot as the presidential candidate of the political party, Independents for Anderson Party of North Carolina. Faced as it was with the cryptic wording of N.C.Gen.Stat. § 163–213.6 and the conflicting interpretations that had been placed upon that statute by the North Carolina State Board of Elections and its Executive Secretary–Director, we conclude that it was proper for the district court, exercising its pendent jurisdiction, to make its own interpretation of that statute. Concluding further that the district court's ensuing interpretation of the statute was, as a matter of law, a valid one, we affirm its injunctive decree directing that Anderson's name be placed on the general election ballot.

### I

The factual background, essentially as recited by the district court in its memorandum opinion, is as follows. At its 1971 session the General Assembly of North Carolina enacted Article 18A of Chapter 163 of the General Statutes entitled "Presidential Preference Primary Act," which provides for a primary election in which the voters of North Carolina are given an opportunity "to express their preference for the person to be the presidential candidate of their

1. The original defendants–the members and Executive Secretary–Director of the North Carolina State Board of Elections–did not appeal. On oral argument we were advised by counsel for the DNC that this did not represent any abandonment by the original defendants of the position being urged by the DNC as intervenor on appeal, but merely a tactical judgment that that position could be adequately represented by the DNC. In substantiation of this representation–which has no relevance to resolution of the legal issues–counsel noted for the court that he was accompanied at counsel table by the Chairman of the State Board of Elections, and that the Attorney General of North Carolina had authorized the Assistant Attorney General to sign and fully endorse the briefs filed by the DNC in this court.

political party," the election to be held on the Tuesday after the first Monday in May of the year in which presidential elections are held. N.C.Gen.Stat. § 163–213.4 provides in pertinent part that the State Board of Elections shall convene on Tuesday following the first Monday in February preceding "the presidential preference primary election" and at that time nominate as presidential primary candidates all candidates affiliated with a political party recognized pursuant to other provisions of the election laws. N.C.Gen.Stat. § 163–213.6, the provision of the Presidential Preference Primary Act that is in controversy here, reads as follows:

§ 163–213.6. Notification to candidates.–The State Board of Elections shall forthwith contact each person who has been nominated by the Board or by petition and notify him in writing that, upon his written request, to be filed with the Board within 15 days of the notice to him by the Board, his name will be printed as a candidate of a specified political party on the North Carolina presidential preference primary ballot. A candidate who participates in the North Carolina presidential preference primary of a particular party shall have his name placed on the general election ballot only as a nominee of that political party. The board shall send a copy of the "Presidential Preference Primary Act" to each candidate with the notice specified above.

Acting pursuant to this statute, the Board on February 6, 1980 notified Anderson that he had been nominated as a candidate for the Republican presidential primary to be held in North Carolina on May 6, 1980. In a letter dated February 12, 1980, Anderson notified the Board that he accepted the nomination.

On April 24, 1980, Anderson publicly announced his intention to withdraw his name as a candidate for the Republican presidential nomination and to pursue an independent candidacy for the office of President of the United States. This announcement was widely publicized in the news media of North Carolina and throughout the nation.

On that same day, Anderson mailed a notarized notice of withdrawal of his candidacy as a Republican presidential candidate to the Board and specifically revoked his previous acceptance of the Board's nomination. He requested that his name be removed from the ballot for the primary election to be held on May 6, 1980, but his letter was not received by the Board until April 30, 1980, at which time the ballots had already been printed and distributed.

Between the date of his acceptance of the Board's nomination on February 12, 1980 and his withdrawal as a candidate on the Republican ticket on April 24, 1980, Anderson's campaign efforts in North Carolina were minimal. He made no visits to the state, opened no campaign offices and set up no campaign apparatus. A total of $2,411.30 was expended in North Carolina by the Anderson campaign to reimburse expenses incurred "to determine the political climate in North Carolina with respect to Anderson's candidacy."

Following his withdrawal from the primary election campaign on April 24, 1980, Anderson was faced with two options as to methods of having his name placed on the November general election ballot in North Carolina: he could have collected signatures on a petition from registered voters of ten percent of the number of votes cast in the last gubernatorial election, or he could have set up a new political party. Had he chosen the petition route, it would have been necessary for Anderson to produce over 166,000 signatures by April 25, 1980, one day after he had announced his candidacy as an independent, a practical impossibility. Anderson therefore chose the new party route.

There followed a series of discussions between Anderson's attorneys and the Executive Secretary–Director of the State Board of Elections concerning procedures to be followed for establishing a new political party and nominating Anderson for President as the nominee of that party. A hand–delivered letter by Anderson's attorneys to the Executive Secretary–Director of the Board dated May 5, 1980, stating counsel's understanding of the manner in which

the Board interprets and applies the law pertaining to the formation of new political parties in North Carolina, was endorsed by Alex K. Brock, the Executive Secretary–Director of the Board, in a statement appended to the end of the letter providing that "I agree that the interpretations of North Carolina law set forth above are accurate." Included in the letter was a paragraph reading as follows:

The fact that a person's name appears on the North Carolina primary as a nominee for the office of President does preclude such person from having his name placed on the general election ballot as the nominee of a new political party for the same office in the same year.

Following the words "does" in the quoted paragraph, however, there appears an asterisk referring to a handwritten notation at the bottom of the letter, apparently made by Mr. Brock, which reads:

* Not in the case of John Anderson inasmuch as he "revoked" his nomination in the N. C. Primary prior to the date of the primary election. (S) AKB

As stated before, when the Board received Anderson's letter withdrawing his candidacy and requesting that his name be removed from the primary ballot, the ballots had already been printed, and on the day of the election Anderson's name remained on the ballot. In fact, absentee ballots containing his name had been distributed by the Board beginning on March 7, 1980, and in the May 6 election Anderson received 8,542 votes, which represented 5.07 percent of the votes cast in the Republican presidential preference primary. This figure included some absentee ballots.

On June 17, 1980, the Board of Elections approved the petition filed on behalf of Anderson to organize a new political party to be known as "Independents for Anderson Party of North Carolina" and certified the party to submit its nominees selected by convention provided the nominees were otherwise qualified under the laws and Constitution of North Carolina. Pursuant to this action of the Board, the party held its convention and in apt time certified the name

of John B. Anderson as its candidate for President of the United States.

On July 29, 1980, the Board held a public hearing, at which both Anderson and the DNC were represented by counsel, to determine the validity of Anderson's placement on the November general election ballot as the presidential candidate of the Independents for Anderson Party of North Carolina. In addition to the foregoing facts, the Board found that Anderson "did participate in the North Carolina presidential preference primary within the meaning of G.S. 163–213.6." It therefore concluded that, while the Independents for Anderson Party of North Carolina was a bona fide political party in North Carolina, Anderson was not qualified to represent that party as its presidential candidate in the November general election.

Anderson, the Independents for Anderson Party of North Carolina and several Anderson supporters immediately instituted suit against the Board in the United States District Court for the Eastern District of North Carolina. In this suit seeking injunctive and declaratory relief filed pursuant to 42 U.S.C. § 1983, they alleged violations of their rights under the first, fifth and fourteenth amendments of the United States Constitution. They contended that, under the Board's interpretation, N.C.Gen.Stat. § 163–213.6 was unconstitutional as applied to Anderson because it deprived Anderson of his first amendment right to run for public office and because it violated the fundamental rights of Anderson's supporters to nominate and vote for the candidate of their choice. In the alternative they argued that the Board had misinterpreted the statute. After a hearing on August 12, 1980, the district court granted the DNC's motion to intervene and issued a temporary restraining order preventing the Board from printing the general election ballots without Anderson's name.

After a subsequent hearing on cross–motions for summary judgment, the district court found that the reference in N.C.Gen. Stat. § 163–213.6 to a "candidate who participates in the North Carolina presidential

preference primary" was intended to include only those candidates who willfully, intentionally or knowingly took part in the primary election itself. It therefore concluded that, because Anderson had "revoked" his nomination as a Republican presidential candidate prior to the date of the North Carolina primary election, his name could not be barred from placement on the general election ballot by virtue of N.C.Gen. Stat. § 163–213.6.

Although the DNC has raised a number of procedural and substantive issues, its appeal resolves itself ultimately into two questions. First, was it proper for the district court to make its own interpretation of N.C.Gen.Stat. § 163–213.6? Second, if so, is the construction that resulted a valid one?

## II

■ In order for a federal court not sitting in diversity to respond to a question of local law, that question must be so entwined with a substantial federal claim "that the entire action before the court comprises but one constitutional 'case.'" *United Mine Workers v. Gibbs*, 383 U.S. 715, 725, 86 S.Ct. 1130, 1138, 16 L.Ed.2d 218 (1965). Although the insubstantiality of federal claims may be demonstrated by pre-

vious decisions that foreclose the subject and leave no room for controversy, *Levering & Garrigues Co. v. Morrin*, 289 U.S. 103, 105–06, 53 S.Ct. 549, 550, 77 L.Ed. 1062 (1933), the Supreme Court has emphasized that to have this foreclosing effect the prior decisions must "inescapably render the claims frivolous," *Goosby v. Osser*, 409 U.S. 512, 518, 93 S.Ct. 854, 858, 35 L.Ed.2d 36 (1972). The DNC has contended, both on this appeal and in the court below, that the decision of the Supreme Court in *Storer v. Brown*, 415 U.S. 724, 94 S.Ct. 1274, 39 L.Ed.2d 714 (1974), renders N.C.Gen.Stat. § 163–213.6 unquestionably constitutional within any reasonably possible interpretation. While we agree that the "disaffiliation" provision upheld in *Storer* was, in general terms, more restrictive than the "sore loser" provision before the district court in the present action, we do not believe that constitutional controversy is thereby foreclosed. It is not entirely clear whether the Supreme Court's statements with respect to California's direct party primary for congressional office would apply with equal force to North Carolina's presidential preference primary.[2] Moreover, as the Court noted in *Storer*,

---

2. *Storer* was actually the decision of the Supreme Court in a pair of cases that, while never technically consolidated, were ruled on together by the trial court. The first, *Storer v. Brown*, involved a constitutional challenge to California's election laws as applied to a direct party primary for congressional office. 415 U.S. at 726–27, 94 S.Ct. at 1277. The decision in this case turned largely on a review of California's requirement that an independent candidate seeking election in the general election "disaffiliate" himself from a "qualified political party" at least one year prior to the primary in which that party nominates its candidate for the general election. *See* Cal.Elec.Code § 6830(d). Finding this statute to be a reasonable means of effectuating the state's interest in maintaining the integrity of the state's *direct party primary process*, the Court rejected the constitutional challenge of the independent *congressional* candidates. *Id.*, 415 U.S. at 733–36, 94 S.Ct. at 1280–82.

The second appeal decided by the *Storer* Court, *Hall v. Brown*, also involved a challenge to the constitutional validity of California's election laws, but this time as applied to a presidential preference primary. *Id.* at 727–28,

94 S.Ct. at 1277–78. Because Hall, an independent presidential candidate had apparently satisfied the one–year "disaffiliation" requirement, *id.* at 738, 94 S.Ct. at 1283, the Court turned its attention in his appeal to the constitutionality of California's signature requirement, a common electoral law prerequisite for placement on a general election ballot as an independent designed to ensure that a candidate is a serious one, *see* Cal.Elec.Code §§ 6831 & 6833. Noting that the constitutionality of such signature requirements turns on the excessiveness of the percentage required and the burdensomeness of the conditions for the acquisition of signatures, the Court remanded for the further hearing necessary to make these determinations. *Id.* at 738–46, 94 S.Ct. at 1283–86.

Therefore, although there may be some implication in *Storer* that what the Court said with respect to the application of a "disaffiliation" requirement to a direct party primary for congressional office has validity with respect to a presidential preference primary, that implication is certainly weakened by the Court's emphasis on the application of its "disaffiliation" decision to a direct party primary, *id.* at 734–

Decision in this context, as in others, is very much a "matter of degree," very much a matter of "consider[ing] the facts and circumstances behind the law, the interests which the State claims to be protecting, and the interests of those who are disadvantaged by the classification." What the result of this process will be in any specific case may be very difficult to predict with great assurance.

*Id.* at 730, 94 S.Ct. at 1279 (citations omitted). We must therefore regard the constitutional challenge to North Carolina's "sore loser" provision as not rendered "wholly insubstantial" by the decision in *Storer*.

■ Assuming the existence of a substantial federal claim, the instant action would seem to fall very much in the mold of *Siler v. Louisville & Nashville R. R.*, 213 U.S. 175, 29 S.Ct. 451, 53 L.Ed. 753 (1909). In *Siler* the Supreme Court held that, in the absence of a ruling from the state's highest court, a federal court may, pursuant to its pendent jurisdiction, ignore the decision of a state administrative agency and make its own ruling on the proper interpretation of a state statute. *Id.* at 193–94, 29 S.Ct. at 455–56. Of course *Erie R. R. v. Tompkins*, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938), decided after *Siler*, now clearly mandates that a federal court look further than a state's highest court for guidance as to the proper construction of a state statute. Indeed, there may be circumstances in which a federal court would be bound by the administrative interpretation of a state agency. We need not now describe those circumstances, however, for it is clear that they were not approached in the present action. Faced with the utter ambiguity of the statutory language, the conflicting opinions of the Board and its own Executive Secretary–Director, and the time constraints imposed by an imminent election, we conclude that the district court had the power and indeed no choice but to attempt its own construction of N.C.Gen.Stat. § 163–213.6.[3]

35, 94 S.Ct. at 1281, and its failure to make any reference whatsoever to a presidential preference primary in this context. Moreover, the inherent differences between direct party primaries for congressional office, which are conducted entirely within a state and are binding on a party, and presidential preference primaries, which are conducted in a number of states and are not binding on a party, would seem to make the implication suggested above even more subject to substantial question.

**3.** Against this conclusion the DNC contended below and on this appeal that the district court should have abstained under principles applied in *Huffman v. Pursue*, 420 U.S. 592, 95 S.Ct. 1200, 43 L.Ed.2d 482 (1975), and on this appeal the DNC has contended that under principles of res judicata the unappealed interpretation of the State Board now provides the inescapable rule of decision for the federal courts. While the contentions raise different legal issues, they are of course interrelated. We are not persuaded by either.

Aside from any question of *Huffman's* basic applicability to a state civil proceeding of the type here involved, *cf. Juidice v. Vail*, 430 U.S. 327, 97 S.Ct. 1211, 51 L.Ed.2d 376 (1976) (principles of federalism and comity apply to a case in which a state's contempt process is involved regardless of whether the contempt proceeding is labeled civil, quasi-criminal or criminal), two other factors militated against abstention in this case. First, as the *Huffman* Court itself expressly noted, the appellate remedies exhaus-

tion requirement imposed in that case is "not inconsistent with . . . the doctrine that a federal equity plaintiff challenging state administrative action need not have exhausted his state judicial remedies." 420 U.S. at 610 & n.21, 95 S.Ct. at 1211 & n.21. Second, as the district court expressly noted, the State Board original defendant joined the federal plaintiffs in urging, because of time constraints, speedy resolution of the issue in the federal action. Considerations of delay are, of course, relevant in making abstention determinations. *See, e. g., Griffin v. School Bd. of Prince Edward County*, 377 U.S. 218, 228–29, 84 S.Ct. 1226, 1231 -32, 12 L.Ed.2d 256 (1964). All factors considered, we conclude that there was no error of law nor abuse of discretion, *cf. Louisiana Power & Light Co. v. City of Thibodaux*, 360 U.S. 25, 79 S.Ct. 1070, 3 L.Ed.2d 1058 (1959) (district court exercised "fair and well-considered judicial discretion" in staying proceedings in federal court pending resolution of issue of state law in state supreme court), in the district court's refusal to abstain.

The res judicata contention goes beyond choice of law concerns in the exercise of a federal court's pendent jurisdiction to determine state law questions. Res judicata would dictate the choice, not on notions of federalism and comity, but because of the preclusive effect to which the valid and final judgment of one court is commonly entitled in any other in our federal system. Pointing out that in appropriate cases the judgment of an administrative

## III

Having concluded that it was proper for the district court to make its own interpretation of North Carolina's "sore loser" provision, we turn now to the question whether that interpretation was a valid one. It should first be noted that N.C.Gen.Stat. § 163–213.6 is a statute that begs for judicial construction or legislative clarification. Not only is its wording subject to a wide variety of interpretations and its administrative construction conflicting, it is accompanied by little in the way of legislative history.[4]

agency acting in a judicial capacity may well be accorded res judicata effect, *see United States v. Utah Constr. & Mining Co.*, 384 U.S. 394, 86 S.Ct. 1545, 16 L.Ed.2d 642 (1966), the DNC here contends that the valid and unappealed final determination of the "participation" issue by the State Board of Elections acting in a quasi–judicial capacity is entitled to res judicata (*collateral estoppel*) *effect in this federal* action. Without questioning the validity of the general proposition, we do not think that this is such a case. Res judicata, particularly in its collateral estoppel branch, is not an inexorable rule even when there is no question of the validity and finality of the judgment invoked. Any court asked to give collateral estoppel effect to the prior determination of an issue by another judicial tribunal is entitled to scrutinize the nature of that tribunal and the nature and *course of its proceedings to ensure that the* traditional guarantees justifying the application of the principle are present. Such scrutiny is indeed integral to the collateral estoppel principle. *See Restatement (Second) of Judgments* § 68.1(b), (c) (Tent. Draft No. 4, 1977). Without the slightest disparagement of the integrity of the State Board or its conduct of the particular proceeding in question, we do not consider that, under the circumstances, its prior determination of the critical issue should be given *collateral estoppel effect in this federal action* wherein substantial federal constitutional questions could turn upon its resolution. Though clearly given quasi–judicial powers by the state, N.C.Gen.Stat. § 163–28, we observe that the Board's composition–for perfectly legitimate reasons–is better designed to equip it for performing its basic administrative–executive function in one of the most politically sensitive areas of state government than for performing its occasional quasi–judicial functions in re*spect of issues arising in that inescapably polit*ical context. By statute, the Board is composed of five members "[n]ot more than three [of whom] shall be members of the same political party," appointed by the Governor to serve for four-year terms. N.C.Gen.Stat. § 163–19. Predictably, and no doubt as intended, the normal composition resulting from this proscription is reflected in the present composition under a Democratic state administration: three Democrats, two Republicans. Being so deliberately composed, no reproach to the membership can be implied where, as here, its quasi-judicial determinations split exactly along party lines, particularly where, as here, the lati-

tude for completely honest disagreement is so palpable. Nevertheless, the deliberately intended political composition of the tribunal must be weighed in the balance when deciding whether fairness to parties in litigation–particularly constitutional adjudication–permits giving preclusive effect to its quasi–judicial determination of an issue having such wholly political consequences. Obviously this factor militates here against preclusion.

Further, we observe that, though the Board's proceeding provided the rudiments of a truly adversarial presentation of the critical issue, that issue was more–perhaps totally–one of law than of fact. In respect of such an issue, this kind of tribunal is not intended nor can it be expected to bring to bear the special expertise of the traditional common–law tribunal. In consequence, though determinations of legal as well as factual issues may sometimes be entitled to collateral estoppel effect, *Restatement (Second) of Judgments*, § 68, comments c, j (Tent. Draft No. 4, 1977), this factor also militates here against preclusion. *See id.* § 68.1(c).

On total balance, we therefore conclude that the determinations of the State Board should not be accorded preclusive effect in this federal action.

4. In the district court, the defendants filed with the summary judgment materials an affidavit by the Hon. J. Allen Adams, a member of the General Assembly of North Carolina during the session at which the challenged statute was enacted. This affidavit identified certain attached documents from which can be traced the evolution of the statute as enacted from the original bill as introduced. Presumably because nonexistent, no reports by committees, floor debates or comparable sources for divining legislative purpose were included. The affiant offered no independent conclusions as to the implications of the identified documents, nor any opinion based upon his participation in the legislative process. The only completely extraneous item included was a contemporary newspaper account of the statute's final enactment, which did contain some assumptions as to its intended operation.

On oral argument on this appeal, counsel for Anderson suggested that the materials were probably inappropriate for consideration on the cross–motions for summary judgment, without specifying whether because of their content or the procedures by which they were made part of the record. Having made the tactical judgment not to object to inclusion of the materials

▆ Despite this virtual absence of guidance, the district court's determination must still be reviewed for its adherence to two principles of statutory construction. The first of these is the canon that where, as here, neither legislative history nor administrative interpretation sheds clear light on the meaning of an ambiguous statute, a court is bound only to render a decision that is reasonable in light of the overall policy of the legislation under consideration and the commonly accepted meaning of the words used in the statute. *See Hassett v. Welch*, 303 U.S. 303, 58 S.Ct. 559, 82 L.Ed. 858 (1938) (by implication). Applying this principle to the construction of N.C.Gen.Stat. § 163–213.6, we conclude that the district court might reasonably have interpreted the critical phrase "participates in the North Carolina presidential preference primary" as meaning (1) notifying the Board, as required by the statute, of one's desire to have one's name placed on the primary ballot,[5] (2) actively seeking election in the primary election itself,[6] or (3) engaging in other activity falling somewhere between those two extremes.[7]

▆ This basic range of choice was rightly influenced, however, by the second principle by which the district court properly felt itself constrained in construing North Carolina's "sore loser" statute. That principle is the constitutional commonplace that a court should avoid, if possible, that construction of a statute that would result in its constitutional invalidation. *Lynch v. Overholser*, 369 U.S. 705, 710–11, 82 S.Ct. 1063, 1067, 8 L.Ed.2d 211 (1962); *Blasecki v. City of Durham*, 456 F.2d 87, 93 (4th Cir. 1972). *See also Siler v. Louisville & Nashville R. R.*, 213 U.S. at 193, 29 S.Ct. at 455, 53 L.Ed. 753. As we have already noted, it is not entirely clear that N.C.Gen.Stat. § 163–213.6, as construed by the Board, would fall within the pale of constitutional validity delineated by *Storer*. We need not further speculate on that question, however, inasmuch as it is obvious that, because decisions on the constitutionality of election statutes are often a "matter of degree," *Dunn v. Blumstein*, 405 U.S. 330, 348, 92 S.Ct. 995, 1005, 31 L.Ed.2d 274 (1972), the relatively less restrictive interpretation of N.C.Gen.Stat. § 163–213.6 made by the district court is that one of the three basic possibilities most likely to withstand constitutional scrutiny. Moreover, it must be remembered that, while a state undoubtedly has a significant interest "in avoiding confusion, deception, and even frustration of the democratic process at the general election," *Jenness v. Fortson*, 403 U.S. 431, 442, 91 S.Ct. 1970, 1976, 29 L.Ed.2d 554 (1971), it is under a duty to use the least restrictive means necessary to effectuate that interest,

below, counsel did not press any objection on appeal, and indeed suggested that the materials were at least as supportive of its contention respecting the statute's proper interpretation as they were of the DNC's.

Both because there has been no formal objection to the consideration of the affidavit and the attached legislative materials, and because, except for the newspaper account, they were apparently appropriate for consideration so far as content is concerned, *see* Fed.R.Civ.P. 56(e), we have felt free to consider them. Without detailed analysis, our conclusion is that they are inconclusive on the precise matter at issue; but our conclusion that the district court's interpretation of the statute's meaning was a valid one has taken them into account.

5. This is the interpretation suggested by the DNC as the most likely reflection of legislative intent: *i. e.*, that a person has "participated" when, having accepted the Board's invitation to have his name printed on the primary ballot as a candidate of a specified political party, he then fails within the period given to accept the invitation to revoke the acceptance. The DNC also, of course, contends that if this be not the proper interpretation, then (3) must be.

6. This is the interpretation contended for by Anderson. It is the interpretation apparently made administratively by the Board's Executive Secretary–Director; and it is, of course, the interpretation made by the district court. The DNC points out that this interpretation does not answer the question of how far into the election day process a candidate must "participate" in order to come under the "sore loser" ban. But of course that question was not presented by Anderson's conduct.

7. This was the interpretation *apparently* made by the State Board, as indicated by its specific, undisputed findings of active campaign activities and expenditures by Anderson after the deadline for accepting the Board's invitation to appear on the primary ballot had expired.

*Storer v. Brown,* 415 U.S. at 760–61, 94 S.Ct. at 1293–94 (Brennan, J., dissenting).

Within these principles of statutory construction we therefore conclude that the district court's interpretation was a proper and valid one. The court's resulting conclusion that under this construction of the state statute and on the undisputed facts Anderson had not participated in the presidential preference primary is manifestly without error, so that the constitutional questions presented are not necessary to decision and Anderson is entitled to the relief sought in this action.

*AFFIRMED.*

