Bill L. **BALLARD**, **Plaintiff-Appellee-Cross Appellant,**

v.

**EL DORADO TIRE COMPANY, Defendant-Appellant-Cross Appellee.**

No. 74–2052.

United States Court of Appeals, Fifth Circuit.

May 9, 1975.

902

Eli H. Subin, Emery H. Rosenbluth, Jr., Orlando, Fla., for defendant-appellant-cross appellee.

J. Thomas Cardwell, George T. Eidson, Jr., Orlando, Fla., for plaintiff-appellee-cross appellant.

Before TUTTLE, COLEMAN and SIMPSON, Circuit Judges.

COLEMAN, Circuit Judge.

This diversity action resulted from the allegedly wrongful discharge of plaintiff, Bill L. Ballard, a Florida citizen, by El Dorado Tire Company, a Michigan corporation. The District Court, sitting without a jury, awarded Ballard $46,352.20 in damages.

We affirm the award of damages and remand for further consideration of the other benefits hereinafter discussed.

El Dorado appeals, contending that the District Judge erred in failing to reduce Ballard's damages by the amount he might have earned in other employment during the unexpired term of his contract. Ballard cross appeals, contending that the District Court's calculation of damages erroneously failed to take into account certain fringe benefits due under the employment contract.

The employment contract was executed on May 31, 1969. It called for Ballard, an experienced tire salesman, to work in Orlando, Florida, for a 5 year term as Executive Vice President and General Manager of El Dorado's Florida subsidiary. The contract provided Ballard with generous compensation:

> COMPENSATION: BALLARD shall receive a base salary of $18,000.00 per year. . . . In addition to the base salary, BALLARD shall receive a commission based upon one per cent of the gross sales of the Florida subsidiary corporation . . . . In addition to the base salary and commission, BALLARD shall receive additional compensation in the form of a credit towards the purchase of stock in the Florida subsidiary company and hereinafter provided.

> BENEFITS: EL DORADO will provide BALLARD with a fully paid group life insurance policy in the amount of $20,000.00, payable to such beneficiary as BALLARD may designate and also a fully paid health, accident and hospitalization policy to cover BALLARD and his family. In addition, BALLARD shall be eligible in the thirteenth month of his employment, and thereafter, to participate in the EL DORADO pension fund and to participate in the benefits thereof as provided in EL DORADO's Pension Plan as filed with Internal Revenue Service. At the appropriate time EL DORADO shall furnish BALLARD with a copy of said pension plan. BALLARD's non-contributory portion will be invested by EL DORADO in the pension fund to the extent of twenty per cent of BALLARD's base salary, annually, not including commissions and other forms of compensation.

In addition Ballard was entitled, upon meeting certain conditions, to 20% of the subsidiary stock.

Other relevant contract provisions dealt with termination and non-competition:

TERMINATION: BALLARD may terminate this employment agreement at any time, upon thirty days written notice to EL DORADO. EL DORADO may, at its option, accept any such resignation without said thirty day notice. EL DORADO may terminate this employment agreement for just cause with either thirty days notice or thirty days base salary in lieu of notice. Upon termination of this agreement by either party as provided herein, BALLARD shall promptly account to EL DORADO and/or the Florida subsidiary corporation for all property of EL DORADO and/or its subsidiary corporation in his hands effective as of the termination date. Upon such termination, BALLARD shall no longer be entitled to any salary or benefits except as may be provided herein or except as may be provided in the aforesaid El Dorado Pension Plan.

NON-COMPETITION: BALLARD agrees that upon his voluntary termination of this agreement or upon the expiration of this agreement by the passage of time and the failure of BALLARD to renew the same, he will refrain from, directly or indirectly, carrying on or engaging in the tire business and from soliciting old customers of EL DORADO and/or its Florida subsidiary within the State of Florida for a period of two years, or for so long as EL DORADO and/or its Florida subsidiary continue to engage in the tire business in the State of Florida, if for less than two years. EL DORADO may enforce this agreement by injunction in a court of competent jurisdiction.

This stipulation *does not* prevail in the event of termination by El Dorado. /s/ H.W.D.

The Ballard-El Dorado relationship was soon jeopardized by negotiations between El Dorado and one of its stockholders, Dodenhoff, who wanted to move to Florida to take over management of the Florida subsidiary. These negotiations culminated in El Dorado's selling all its stock in the Florida subsidiary to Dodenhoff. The contract of sale was executed on July 11, 1971. The sales price included the 31,000 shares Dodenhoff held in El Dorado.

Ballard filed this action to determine his rights under his employment contract on October 19, 1971.

Upon receiving a copy of the complaint, Dodenhoff wrote Ballard telling him that the filing of suit constituted a "breach of contract" and a "voluntary resignation".

The District Court did not agree with Dodenhoff's assessment. It held El Dorado's sale of the subsidiary constituted a breach of contract, and that holding is not appealed.

El Dorado does appeal the Court's refusal to mitigate Ballard's damages by what he might have earned in other employment.

Ballard cross appeals the Court's holding that he was not entitled to compensation for loss of pension benefits and stock in El Dorado.

I. The El Dorado Appeal—Did the District Court err in failing to mitigate Ballard's damages by the amount he might have earned in other employment?

The District Court found as a fact that Ballard has not sought other employment.[1] Furthermore, the Court took note of the general principle that an employee's damages will be mitigated by what he could have earned in similar employment. E. g., 11 Williston on Contracts (3rd ed.) § 1358; Lerman v. Fruit Processors, Inc., D.C.Cir., 89 U.S.App. D.C. 188, 191 F.2d 349, citing Rest. Contracts, § 336, cert. denied, 342 U.S. 877, 72 S.Ct. 168, 96 L.Ed.2d 659 (1951); Latimer v. York Cotton Mills, 66 S.C. 135, 44

---

1. Ballard's inaction is the result of the advice of a lawyer who told him that seeking similar employment might violate the non-competition clause in the contract, thereby subjecting Ballard to a law suit. The lawyer's advice was based in part on a letter by Dodenhoff telling Ballard that his filing suit constituted a "voluntary resignation". Voluntary resignation is the act that triggered the operation of the non-competition clause.

S.E. 559 (1903). The District Court's refusal to allow mitigation was based upon the theory that the burden to prove the existence of similar employment was upon the employer, and that El Dorado had failed to show that similar employment was available.

Our examination of the cases and of other authorities demonstrates that the District Court was correct. The universal rule is that an employee's damages will be mitigated only if the employer proves that similar employment opportunity was available. As explained in Dobbs, Remedies, § 12.25, p. 925:

> The recovery is based on contract price, not on the contract price/market value differential so commonly used in sales cases. The employee need only prove the breach and the contract price when he is wrongfully discharged and this will warrant a judgment in his favor for all future installments due him, reduced to present value. If the employee has obtained a substitute job, or could obtain one by reasonable effort, he is chargeable with the income he obtains or could reasonably obtain in this fashion, but only if the employer sustains the burden of proving these facts.

According to the Third Circuit,

> " '[T]he plaintiff is *prima facie* entitled to the stipulated compensation for the whole time. If so, the burden of proof in regard to his employment elsewhere, or his ability to obtain employment, must necessarily rest on the defendant. All evidence in mitigation is for a defendant to give. In its nature it is affirmative, and hence it is for him to prove who asserts it.' " McAleer v. McNally Pittsburg Manufacturing Co., 3 Cir., 1964, 329 F.2d 273, quoting King v. Steiren, 44 Pa. 99.

For an extensive list of cases that have placed the burden to prove that similar employment was available upon the employer, see 11 Williston on Contracts § 1360.

Sensing the weight of authority against its position, El Dorado attempts to escape the burden of proving the existence of similar employment in two ways.

First, it points to the Non-Competition Clause in the contract. El Dorado says that by preventing Ballard from engaging in similar employment, the clause gave rise to a duty to mitigate by seeking *any* employment. It says, in other words, that the effect of an agreement not to compete in similar work is to change the employee's common law duty to mitigate by seeking *similar* employment to a duty to mitigate by seeking *any* employment. Ballard's damages therefore should be mitigated not by what he could have earned in similar employment but by what he could have earned in any employment.

The ready answer to this contention is that there is no such term in the contract. The contract speaks of a negative duty—the duty not to compete with the former employer by seeking similar employment. It does not include an affirmative promise to mitigate damages by seeking dissimilar employment.[2]

A second and equally persuasive answer to El Dorado's argument is that the non-competition clause did not govern this termination. By its literal terms, the promise not to compete applied only to a *voluntary* termination. Ballard's termination was not voluntary. El Dorado's sale of the subsidiary made it impossible for it to perform its promises to Ballard. Ballard was powerless to prevent the contract termination. His employment termination was involuntary; therefore, the contract promise not to seek similar employment did not come into play.

As its next argument for escaping the burden of proving existence of similar

---

2. Nevertheless, a Florida court has indicated that a non-competition clause has the effect El Dorado attributes to it. See Reed Construction Corporation v. Zimmerman, 133 So.2d 579, 580 (Fla.App.1961). In *Reed,* the employee had actually obtained other work, so the issue of whether damages is mitigated by any type work where the work is not actually obtained was not at issue.

employment, El Dorado cites our decision in Nello L. Teer Company v. Hollywood Golf Estates, Inc., 5 Cir., 1963, 324 F.2d 669, 672, cert. denied, 377 U.S. 909, 84 S.Ct. 1169, 12 L.Ed.2d 178, where we said that an independent contractor, whose contract had been breached, must prove the non-existence of similar employment opportunities in order to escape mitigation. This language is consistent with the holdings of many courts which have reasoned that an independent contractor is in a much more favorable position to know the availability of other contracts than is his employee who is likely to be unfamiliar with the contracting business. See, e. g., the leading case of Green v. Nelson, 120 Utah 155, 232 P.2d 776 (1951).

■ Decisions like *Teer* and *Green* have always been distinguished from master-servant contracts since "the employer may in fact know as much or more about the job market than the employee", Dobbs, Remedies, § 12.25, p. 925. The independent contractor cases are simply an exception to the general rule that the burden to prove the existence of similar employment opportunity is upon the employer.

This reduces the present inquiry to the question of whether the evidence, introduced by defendant, constituted legally sufficient proof of similar employment opportunity. The only substantial proof of the existence of similar employment was the testimony of an expert witness who reported that employment statistics showed an extremely low rate of unemployment in Orlando for "professional technicians and managers"—the general class of potential employees to which plaintiff belongs.

Accepting this evidence as a proven fact,[3] our inquiry is whether the availability of employment in the general employment category (here managerial, professional, and technical) is "similar employment" opportunity, such that an employee's damages must be reduced by what the employee might have earned in that general category.

■ All the authorities which have addressed the question answer that an employee's damages are reduced only if the employer proves with reasonable certainty that employment was available in the *specific line of work* in which the employee was engaged. See, e. g., Williams v. Leaf Tobacco Co., 293 Ky. 270, 168 S.W.2d 570 (1943); H. J. McGrath Co. v. Merchant, 117 Md. 472, 83 A. 912 (1912); Stoffel v. Metcalfe, 145 Neb. 450, 17 N.W.2d 3 (1945); Parker v. Twentieth Century Fox Film Corp., 3 Cal.3d 176, 89 Cal.Rptr. 737, 474 P.2d 689 (1970); Annot. 44 A.L.R.3rd 629.

■ This means that El Dorado could meet its burden of proof only by showing the availability of a managerial type position in the tire industry. Were the contrary true, the rule requiring the employer to prove the availability of similar employment would be meaningless. The employer could always meet the so-called "burden" simply by introduction of the help-wanted ads of a local newspaper. The law does not allow contract breachers to escape consequences of their wrongful acts in such a perfunctory fashion.

The District Court was correct in refusing to mitigate Ballard's damages by what he might have earned in other employment.

II. The Ballard Appeal—Did the District Court err in failing to take into account certain fringe benefits in the contract?

*The Stock Provision*

Paragraph 6 of the contract reads:

STOCK OPTION: It is the intention of both **EL DORADO** and **BALLARD** that **BALLARD** shall eventually become a stockholder in the Florida subsidiary corporation to the extent of

---

**3.** The District Judge made no specific finding on the question whether work in plaintiff's general employment category was available. Since the testimony on the subject was credible and uncontradicted, and to avoid a superfluous remand, we assume the Judge accepted the testimony.

twenty per cent of its capital as determined at the end of the first twelve months of the subsidiary's existance. To enable BALLARD to purchase such stock, he shall receive from the Florida subsidiary corporation additional compensation measured by twenty per cent of the subsidiary corporation's net profit after taxes annually. Said additional compensation shall not be paid to BALLARD but shall be retained as credit to BALLARD's account on the books of said subsidiary corporation. Stock certificates reflecting ownership of fifteen per cent of the authorized capital stock of the Florida subsidiary corporation shall be issued to BALLARD when BALLARD's credits computed as aforesaid shall be equal to fifteen per cent of the capital of the Florida subsidiary corporation as determined at the end of the first twelve months of its existence. Thereafter BALLARD shall have an option to purchase an additional five per cent of the capital stock of the Florida subsidiary corporation and the option price for said stock shall be determined by the book value of the stock at the time the original fifteen per cent stock is issued to BALLARD. The additional five per cent stock shall be issued to BALLARD when the credits computed as aforesaid shall equal the option price of said stock. Any and all stock issued to BALLARD under the provisions of this agreement shall be nontransferable and shall be redeemed by the Florida subsidiary from BALLARD in the event of the termination of this employment agreement or any extensions hereof, or from his estate in the event of his death, at book value as of the date of such redemption. In the event that BALLARD's employment with EL DORADO shall be terminated prior to the issuance of either the first fifteen per cent stock interest or the additional five per cent stock interest in the subsidiary corporation as provided above, then any accrued credit to BALLARD on the books of the company on account of acquisition of such stock interest shall be terminated and be null and void and BALLARD shall not have any claim against the subsidiary corporation or against EL DORADO for any interest in said credit whatsoever.

Despite this provision, the District Court refused to award any damages for the loss of stock in the company. This refusal was based on the fact that the contract rendered Ballard's credit toward stock "null and void" if his employment was terminated before the stock was issued.

We find ourselves in disagreement with that interpretation. The stock provision is a conditional promise. El Dorado promised to issue the stock to Ballard on the condition that his contract not be terminated before his credits entitled him to it.

Fulfillment of a contract promise, here to issue stock, is not excused by failure of a condition (non-termination) which the promisor himself causes to happen.[4]

It is a principle of fundamental justice that if a promisor is himself the cause of the failure of performance, either of an obligation due him or of a condition upon which his own liability depends, he cannot take advantage of the failure.

In reflecting upon this jural proposition, a federal court has observed that "Where liability under a contract depends upon a condition precedent one cannot avoid his liability by making the performance of the condition precedent impossible, or by preventing it". The illustrations of this principle are legion. 5 Williston on Contracts § 677, pp. 224–225, quoting Gulf Oil Corp. v. American Louisiana Pipe Line Co., 6 Cir., 1960, 282 F.2d 401.

**4.** The reason for this result is that the law implies a promise not to frustrate occurrence of an explicit promise. One who promises to do a thing if a given condition occurs has impliedly promised not to prevent the performance of the condition. Otherwise, any conditional promise would be illusory, not real.

■ In this case, the failure of the condition is the product of the promisor's (El Dorado's) own act. Hence, El Dorado cannot rely upon it to escape performance. Ballard is entitled to recover for loss of stock if he would have earned the stock but for El Dorado's prevention of his fulfilling the condition of non-termination.

### The Provision for Issuance of 15% of Company Stock

The event that was to trigger payment of 15% of company stock was the subsidiary's making enough profits so that 20% of the net profits would amount to 15% of the "capital" as determined at the end of the first year. Use of the term "capital" causes difficulty since the term is susceptible of several meanings.

Defendant contends, and the District Judge held, that the value of the "capital" is the book value of the capital stock; i. e., the difference between the value of the assets and the value of the liabilities. This amount is $40,000. Plaintiff suggests that capital means the fair market value of the stock, an amount he claims to be $300,000, the amount for which defendant once offered to sell the subsidiary.

■ We think that a seller's asking price is no indication of a corporate value, and that in view of the lack of any other evidence on the question of market value, the only reliable way to determine the value of the capital was to consider the corporation's stock's book value as being the "capital". Hence, we hold that the District Judge was correct in deciding $40,000 to be the value of the capital.

This means that Ballard is entitled to the value of 15% of the "authorized capital stock" if, during the five year term of his employment contract, 20% of the company's net profits would have amounted to 15% of the value of the authorized capital stock.

Since we have determined the trial judge correctly found $40,000 to be the value of the capital, $40,000 is also the value of the "authorized capital stock" regardless of how many shares are authorized. Eisner v. Macomber, 252 U.S. 189, 40 S.Ct. 189, 64 L.Ed. 521 (1920).

Thus, Ballard is entitled to 15% of $40,000 or $6000, if 20% of the company's net profits during the term of Ballard's contract have amounted to $6000. There is no finding in the record on this question. We therefore remand with directions to determine whether 20% of the company's net profits during the term of Ballard's contract would have amounted to $6000 (the value of 15% of "authorized capital stock"). If so, the District Judge is to add $6000 to Ballard's damages.

### The Provision to Issue an Additional 5% of Company Stock

The provision for issuance of an additional 5% of company stock provides another complication. Under it, the Judge must determine whether, during the contract term, 20% of the company net profits would have amounted to $6000 (15% of the book value of the stock at end of the first year) plus the book value of an additional 5% of the company stock (as determined at the time the first 15% of stock would have been issued). If so, he is to award plaintiff the book value of the additional 5% of company stock (as determined at the time the 15% of authorized capital stock would have been issued). This question must also be determined on remand.

### Pension Benefits

■ The contract provided that, beginning with the second year, employer El Dorado would contribute 20% of Ballard's salary to the company's pension plan. However, the contract made no provision for distribution of the benefits. Provision for benefits was contained only in the pension plan itself. The plan promised benefits only to those em-

ployees who worked to within five years of normal retirement (age 65).[5]

Ballard's employment contract was for 5 years, and he was 41 years old when hired. Thus, there was no promise either in the contract or in the pension plan that was incorporated in the contract to include Ballard within the category of employees to whom pension benefits would be paid. There can be no damages for loss of benefits not promised. Ballard is entitled to nothing for loss of pension benefits.

Affirmed in part; and in part remanded for further proceedings not inconsistent herewith.

5. Article IX of Plan

1. If a Participant shall cease to be an Employee for any cause except death, retirement on the Normal Retirement Date or retirement prior to his Normal Retirement Date as provided in paragraph (7) of Article IV, then his participation in the Trust shall terminate and he shall be entitled to receive the Contracts issued on his life. [Life insur-ance contracts were purchased by the employee at his option.]

2. However, if terminations of employment shall occur within five years of the Normal Retirement Date of the Participant, he shall, in addition, be entitled to his share of the Auxiliary Fund [monetary benefits paid into the fund], regardless of the number of years he shall have been a Participant hereunder.