**Raymond J. DONOVAN, Secretary of Labor, United States Department of Labor, Plaintiff,**

v.

**PETER ZIMMER AMERICA, INC., a Corporation, Defendant.**

Civ. A. No. 78–1010–0.

United States District Court, D. South Carolina, Spartanburg Division.

June 29, 1982.

William H. Berger, U.S. Dept. of Labor, Atlanta, Ga., Andrea C. Casson, U.S. Dept. of Labor, Washington, D.C., for plaintiff.

Donald E. Jonas, Jonas & Jonas, Columbia, S.C., for defendant.

## ORDER

MATTHEW J. PERRY, Jr., District Judge.

This action was commenced against the defendant by the Secretary of Labor pursuant to Section 11 of the Occupational Safety and Health Act of 1970 (29 U.S.C. § 651 *et seq.*). The complaint alleges that the defendant, a corporation doing business within the jurisdiction of this Court, is engaged in a business affecting commerce; that on May 31, 1977, officials of the Division of Occupational Safety and Health of the South Carolina Department of Labor inspected the defendant's premises at Spartanburg, South Carolina pursuant to a complaint filed by an employee of the defendant; that on June 13, 1977, Olan Foster, Jr., an employee of the defendant filed a complaint with the South Carolina Department of Labor in which he alleged that he was being harassed in his employment because of the May 31, 1977 OSHA inspection; that on June 30, 1977 three of the defendant's employees, John Upton, Douglas Walker and Olan Foster, Jr., were discharged from their employment and that the said discharges constitute violations of § 11(c) of the Act. Plaintiff therefore seeks an Order requiring the defendant to reinstate the employees above named with back pay and interest and an Order enjoining the defendant from committing further violations of § 11(c) of the Act.

In its answer the defendant denies any violation of the Act and asserts that Upton, Walker and Foster were discharged because of misconduct on their part including absenteeism. Defendant also asserts that the matters and things complained of in the complaint have been fully considered by the South Carolina Department of Labor and decided adversely to the above named employees and that, hence, the plaintiff is collaterally estopped from proceeding on its complaint in this Court.

The matter was tried before the Court without a jury. Having considered the evidence, the demeanor of the witnesses and the briefs and arguments of counsel, I find as follows:

## FINDINGS OF FACT

1. Defendant, Peter Zimmer America, Inc., is a corporation with an office and place of business in Spartanburg, South Carolina.

2. Defendant is engaged in the production of textile machinery, which is generally manufactured in Austria (Tr. 250, 584). The operation in the United States is primarily involved in the production of spare and replacement parts for the machinery (*id* at 252).

3. On September 13, 1976, John Upton was hired by defendant as a machinist at the rate of $5.40 per hour (Tr. 35). At the time, he had been a machinist for approximately 15 years (*id* at 37).

4. On September 20, 1976, Douglas Walker was hired by defendant as a machinist apprentice at the rate of $3.75 per hour (Tr. 402, 404).

5. On October 11, 1976, Olan Foster, Jr., was hired by defendant as a machinist at the rate of $5.40 per hour (Tr. 320). He has been a machinist since 1959 (*id* at 322).

6. At the time each of the three men were hired, no written company rules or personnel policies were supplied (Tr. 38, 166, 323, 407, 490, 511–512). The men were orally told, however, that if they were to be off work, i.e., off the clock, then permission should be obtained (*id* at 39, 232, 407, 490, 513–514).

7. During their employment, Mr. Upton, Mr. Foster and Mr. Walker were the only employees directly involved in the in-shop manufacturing of the replacement and spare parts for the machinery (Tr. 39, 85–88, 324). Mr. Ralph C. Crocker was the foreman of the parts shop (*id* at 38, 84, 410, 484), and Mr. Michael Mesardjian was the parts stockperson or storekeeper (*id* at 231, 461). These five persons worked in the "back" part of defendant's Spartanburg facility. Mr. Ruediger Koch was executive vice-president of defendant and in overall charge of the South Carolina operation (*id* at 163–164).

8. On May 31, 1977, a health inspection of defendant's premises was conducted by Compliance Officer Gerald A. Reeves of the South Carolina Department of Labor, Division of Occupational Safety and Health (Tr. 42, 305, 412). The inspection was conducted pursuant to a complaint filed with the South Carolina Department of Labor by an employee of defendant (*id* at 305) and Mr. Koch was so informed (*id* at 176, 183, 318). A copy of that complaint, with the complainant's name omitted, was left with Mr. Koch (*id* at 177, 308–309, 318; Defendant's Exhibit 16). Mr. Koch asked Mr. Reeves to identify the complainant, which Mr. Reeves declined to do (*id* at 180, 314).

9. The complaint alleged that there was improper ventilation of fumes during welding, no ventilation in the restrooms and other unspecified minor violations (Tr. 176, 307, 411; Defendant's Exhibits 16 and 17).

10. The health inspection conducted on May 31, 1977, resulted in the finding of no violations for the following reasons:

(a) there was no welding being performed on that day, thus there was no way to measure fume levels or ventilation of the fumes;

(b) there is no employee health or safety standard relating to ventilation in restrooms; and

(c) there was no way to deal with unspecified minor violations (Defendant's Exhibit 18; Plaintiff's Exhibit 19).

11. During the course of his inspection, Compliance Officer Reeves interviewed Mr. Upton, Mr. Foster and Mr. Walker individually in foreman Crocker's office concerning the complaint and the working conditions (Tr. 43, 309, 313, 326, 412), a fact of which Mr. Koch was aware (*id* at 177–178). The Compliance Officer did not interview Mr. Mesardjian (*id* at 463). The only persons who were likely to have been affected by fumes from welding would have been Foster, Upton, Walker and Crocker who worked in the back section (*id* at 488–489).

12. After the completion of the safety and health inspection, Mr. Koch separately called John Upton, Olan Foster and Mike Mesardjian into his office and asked each of them whether he had filed the OSHA complaint (Tr. 44–45, 181, 203, 327, 463). Upton, Foster and Mesardjian denied making the complaint (it had in fact been made, in writing, by Douglas Walker (*id* at 410–411)) and refused to tell Koch who had filed the complaint (*id* at 45, 119, 327–328, 463). Koch told Foster directly that if Foster did not tell Koch who filed the complaint, Koch would fire Foster (*id* at 327, 368, 493 cf. 181). Mr. Walker was called into Mr. Koch's office the next day because he was also suspected of making the complaint (*id* at 252), and when asked, denied phoning in a complaint because he mailed it in. Mr. Mesardjian also denied making the complaint and was told that Mr. Koch believed him (*id* at 463).

13. The day after the OSHA inspection, Mr. Koch called the South Carolina Department of Labor in an effort to find out who had filed the OSHA complaint. When he was told that this information could not be given out, he asked whether it was one of his employees. Koch read off a list of the approximately 13 current employees and was told it was one of the persons on the list (Tr. 185–186).

14. Mr. Koch admitted he went to great lengths to find out who had filed the complaint (Tr. 186), and was clearly displeased, angry and upset over the filing of the complaint (*id* at 46, 127, 328, 413, 492).

15. Within a few days after the OSHA inspection, Mr. Koch instructed the foreman to inform the workers in the back that they no longer could use the telephone for incoming or outgoing calls because of the OSHA complaint (Tr. 47–48, 190–191, 329, 354–355, 414–415, 495–496).

16. Within one week after the OSHA inspection, the air conditioning in the back section of defendant's facility was turned off and the back loading door was ordered to be left open (Tr. 47–48, 49, 188–189, 206, 329, 414, 495). Mr. Crocker testified that Mr. Koch made it appear that the turning off of the air conditioner was in retaliation for the OSHA complaint (*id* at 495, 508–509). Because of the heat generated by the

running of machinery and welding, with no ventilation, it became very hot and uncomfortable in the back section with temperatures over 100 degrees Fahrenheit (*id* at 50, 191–192, 193, 334, 415, 496). Mr. Crocker was told he could get an air conditioner for his office at company expense (*id* at 496).

17. Both before and after the OSHA inspection, Foster, Upton and Walker complained to management about the lack of any ventilation for fumes while welding (Tr. 40, 325, 347–348, 409, 422–423, 487–489). They requested a smoke vent or at least floor fans, but no relief from the fumes was ever provided up to the time they were discharged on June 30, 1977 (*id* at 325, 448, 469, 489).

18. Subsequent to the OSHA inspection, and particularly after the interrogation of Foster, Upton and Walker, the relationship between the three and Mr. Koch, which was cordial up to that time, cooled off considerably, although no specific incidents occurred and the three men's work did not suffer (Tr. 50, 193, 325, 334–335, 497, 532).

19. By letter dated June 13, 1977, Mr. Foster wrote to the South Carolina Department of Labor alleging harassment on the part of Mr. Koch because of the threats from Mr. Koch, the air conditioning being turned off and the phone privileges being taken away (Tr. 330–331, 367; Plaintiff's Exhibit 12).

20. On June 28, 1977, Mr. Upton requested permission from foreman Crocker to return late from lunch the next day because he wanted to go to a Pizza Hut approximately four miles away (Tr. 52–53, 91). Driving time each way was approximately 10–15 minutes (*id* at 52–53, 336, 497). On June 29, 1977, Mr. Foster, Mr. Walker and Mr. Mesardjian joined Mr. Upton for lunch (*id* at 53, 94, 336, 416, 465). Each employee had a 30-minute lunch break, from 12:30 p.m. to 1:00 p.m. (*id* at 94, 421). Mr. Crocker gave permission for the employees to return late from lunch (*id* at 53, 336, 415). No discussion was had as to how late they could return, although they had returned about 20–25 minutes late from lunch the week before (*id* at 498, 518). At

that time, Crocker asked the employees to request permission in advance if they were going to be late returning from lunch in the future (*id* at 157–158, 498).

21. After leaving for lunch at 12:30 p.m. on June 29, 1977 (Tr. 53, 94), the four employees returned to defendant's place of business at 2:50 p.m. (*id* at 54). They were late returning because they had to wait for pizza and because they disliked going back to the hot building (*id* at 54, 95, 465). Quitting time for Upton, Foster and Walker was 3:30 p.m. (*id* at 95, 321, 404), and 4:30 p.m. for Mesardjian (*id* at 465). Mr. Walker and Mr. Mesardjian punched back in at 2:50 p.m. and resumed work, whereas Mr. Upton and Mr. Foster did not punch back in and went home (*id* at 54–55, 97, 418, 448, 465–466). This meant, taking into account the permission to return late, that Upton and Foster were off the clock an extra two hours and Walker an extra one hour and 20 minutes. The reasons Mr. Upton and Mr. Foster did not punch back in were because the temperature in the back was over 100 degrees Fahrenheit (*id* at 510) and because little work could be done in the remaining 40 minutes (*id* at 55, 98, 334, 337, 353, 365). None of the four employees considered that they were in violation of any company rule by returning late or remaining off the clock nor subject to dismissal because of the company's liberal attitude toward time off the clock (*id* at 55, 112–114, 338–339, 391, 416–417). The foreman had left for the day at approximately 11:00 a.m. to take his son to the doctor (*id* at 91, 336, 499). If Mr. Crocker had been at work at 2:50 p.m., Mr. Upton and Mr. Foster would have asked off the rest of the afternoon (*id* at 151, 160, 366).

22. After being informed on June 30, 1977, of the late return of the four employees the day before (Tr. 195–198), Mr. Koch told foreman Crocker that he was going to fire Upton, Foster and Walker (*id* at 198, 204, 502–503). Crocker did not want the men to be fired, and stated that if it were up to him, they would not be fired (*id* at 198–202, 502–503).

23. There had been other instances of employees of defendant staying away from work for extended periods after lunch with no reprisals from management (Tr. 51–52, 55–56, 111–112, 335, 339, 345–347, 408, 464).

24. Mr. Koch informed Mr. Mesardjian in the early afternoon of June 30, 1977, that Koch was not going to fire Mesardjian because Koch wanted to give Mesardjian another chance (Tr. 202, 207, 209, 467). He told Mesardjian to leave for the rest of the afternoon so that Mesardjian would not tell the three men they were being fired (id at 468). He also told Mesardjian that he was firing the three men because he had had enough from them (id at 467–468).

25. Upon the instruction of Koch and at the end of the workday on June 30, 1977, Upton, Foster and Walker were told by foreman Crocker that they were being fired (Tr. 56–57, 221, 339, 418, 503–504). Walker asked why and was told that it was because of their late return from lunch on June 29, 1977 (id at 152, 418–419). At no time did Mr. Koch directly talk to or discuss with the three men the firing or the circumstances surrounding the June 29, 1977, late return from lunch (id at 57, 204, 340, 419, 504).

26. At the time they were fired, Mr. Foster was making $6.40 per hour (Tr. 320); Mr. Upton, $6.10 per hour (id at 35); and Mr. Walker, $4.180 per hour (id at 402).

27. From the time they were hired until June 30, 1977, it was the understanding of the three men who were fired, that they could take time off whenever they wanted as long as they had prior permission so as not to disrupt production and as long as they were off the clock (Tr. 39, 89–90, 323). In fact, John Upton, whose wife was in the hospital in Greenville, South Carolina, 25 miles from Spartanburg, South Carolina, for an extended time because of back surgery and who had children at home, was liberally given permission to be off the clock (id at 37, 78–79).

28. From the time the three men were hired until June 30, 1977, defendant had no explicit written personnel policies as to absenteeism or tardiness (Tr. 168–169, 171–172, 225–226).

29. At the time the three men were hired and continuing until June 30, 1977, the three men were never informed what amounts of tardiness or absenteeism would subject them to discipline, including discharge, although each knew that excessive tardiness and unexcused absences were not considered attributes of a good employee (Tr. 151–152, 203–204, 335, 451, 475–477, 490, 498).

30. Mr. Koch was unaware of the three men ever having been absent or tardy without permission prior to June 30, 1977 (Tr. 202, 208).

31. At all times during their employment, the work performance of Foster, Upton and Walker was considered to be very good, they always finished their work on time, and there was never a complaint made to any one of them concerning their work (Tr. 165, 174, 326, 391–392, 487). They had in fact been hired as top-of-the-line machinists (id at 165, 505–506). Foster and Upton had received two raises and Walker three raises after being hired (id at 35, 320, 402). The working relationship among the three men and with foreman Crocker was always good (id at 40–41, 79, 325, 334, 422, 487).

32. Approximately one month after the three men were discharged, foreman Crocker unsuccessfully attempted to convince Mr. Koch to rehire them because they were among the best workers he had ever supervised and he was in need of good workers (Tr. 504–505, 506–507).

33. As of October 1, 1976, Mr. Michael Mesardjian was required to punch a time clock (Tr. 229, Defendant's Exhibit 7). From May 12, 1977, until June 6, 1977, he was late returning from lunch on at least five occasions and a memo to that effect was sent to Mr. Koch by the office secretary on June 6, 1977, but no action was taken (Plaintiff's Exhibit 8, Tr. 207).

34. Shortly after the termination and by August 1, 1977, Mr. Koch had a set of company rules prepared in writing (Plaintiff's Exhibit 6) so there would be no questions of what the rules were (Tr. 171–172). The rules provided *inter alia:*

(a) TARDINESS (Unexcused): A warning will be issued for the first and second offense for tardiness from 0 to 6 minutes, and dismissal on the third offense (within one year's time). Tardiness over 6 minutes will result in one warning and dismissal on the second offense (within one year's time).

(b) ABSENTEEISM (Unexcused): Results in immediate dismissal.

These written rules were more specific than any previous unwritten rules in effect at Peter Zimmer (Tr. 216).

35. Mr. Koch considered what the four men did on June 29, 1977 as coming back late from lunch (Tr. 195, 196) and viewed this as tardiness (*id* at 214) and admitted that under the newly promulgated rules, the three men were entitled to a warning and were not subject to discharge for this first offense (*id* at 211, 217).

36. Between August 1, 1977, and September 19, 1977, Mr. Mesardjian was tardy returning from lunch on 16 of 31 working days, and was late by more than 6 minutes on 5 occasions (Tr. 220). A memo to that effect was sent by the office secretary to Mr. Paul Frankhausen, vice-president in charge of service for defendant (Plaintiff's Exhibit 9). No action was taken against Mr. Mesardjian (Plaintiff's Exhibit 10; Tr. 221), notwithstanding the explicitness of the newly enacted company rules.

37. Pursuant to the Court's Order of April 24, 1979, it is deemed established for the purpose of this action that subsequent to July 15, 1977, employees of defendant have been tardy (unexcused) from 0 to 6 minutes for three or more times within one year's time without being disciplined for tardiness or absenteeism, and that subsequent to July 15, 1977, employees of defendant have been tardy (unexcused) over 6 minutes two or more times within one year's time without being disciplined for tardiness or absenteeism.

38. Defendant has been precluded by sanction from presenting evidence of other employees having been disciplined or discharged for tardiness or absenteeism.

39. The June 13, 1977 harassment complaint of Mr. Foster was turned over to South Carolina Department of Labor's Conciliation Division (Plaintiff's Exhibit 13) and assigned to Paul Rowland, a labor conciliator (Tr. 535–536).

40. By the time Mr. Rowland contacted Mr. Foster, who acted as spokesman for the three men (Foster, Upton and Walker), the three had been fired (Tr. 537, 555–556). Mr. Rowland thereupon treated the complaint as one involving the discharge of the three men and attempted to get Mr. Koch to voluntarily rehire them (*id* at 537).

41. By letter dated July 14, 1977, addressed to Commissioner E.L. McGowan and received at the South Carolina Department of Labor on July 21, 1977, an attorney representing Foster, Upton and Walker filed a complaint with the South Carolina Department of Labor concerning the discharge of the three men because of health complaints concerning ventilation (Plaintiff's Exhibit 27; Tr. 538–540). Mr. Rowland treated the letter as a second complaint concerning the June 30, 1977, discharges, the first being made on June 30, 1977, when Rowland spoke to Foster about the harassment complaint (Tr. 540).

42. Subsequently, Mr. Rowland unsuccessfully attempted to conciliate the discharge claims of Mr. Upton, Mr. Foster and Mr. Walker. At no time did he conduct an investigation; his assignment was strictly to conciliate (Tr. 296–297, 301, 543, 546–547). Mr. Rowland's conciliation efforts consisted of telephonic interviews with Foster, Upton and Walker, and a personal interview of Koch and Crocker (*id* at 540–543, 550–557). By letter dated August 19, 1977 (Defendant's Exhibit 12), Mr. Koch was told that "the matter [was] finalized." On the same date, the three men were informed by letter of the failure of the conciliation effort (Defendant's Exhibit 2; Tr. 542).

43. During the course of Mr. Rowland's conciliation effort, the three men were relying on him to get them their jobs back (Tr. 393, 455, 541, 557–558, 564–565).

44. The complaint from the three men concerning their discharge to the United

States Department of Labor was received on September 6, 1977 (Plaintiff's Exhibit 24, Tr. 457).

45. From July 1, 1977, to January 1, 1980, when he entered upon other permanent employment which he does not want to leave, John Upton earned a total of $11,-771.05 (Plaintiff's Exhibit 3). His earnings at defendant for that period would have been $31,720.00. He diligently sought employment as a machinist at approximately 30 places during this period (Tr. 57–61, 136–139, 150, 153).

46. From July 1, 1977, to September 8, 1978, when he entered upon other permanent employment which he does not want to leave, Olan Foster, Jr., earned a total of $5,022.26 (Tr. 342). He also received $2,886.00 in unemployment compensation (*id* at 381). His earnings at defendant for that period would have been $15,872.00. He diligently sought employment at over 30 places during this period (*id* at 340–342, 358–361).

47. From July 1, 1977, to September 9, 1977, when he entered upon other permanent employment which he does not want to leave, Douglas Walker had no earnings (Tr. 419–420). His earnings at defendant for that period would have been $1,920.00. He diligently sought employment during these two months at a number of places during this period (*id* at 419, 445).

48. During the period the three men were unemployed, there was a readily available group of skilled machinists for hire in the Spartanburg, South Carolina, area (Tr. 593), and there were just so many places a machinist could apply for work as a machinist (*id* at 445–446, 451–452).

49. Each of the three employees filed unemployment compensation claims after being discharged. The initial determination, by a claims adjudicator, done without a hearing, was to disqualify the men from receipt of unemployment compensation for 10 weeks (out of a maximum of 26 weeks) (Defendant's Exhibit 13). Upon appeal by the employees, and after a hearing, the appeals referee reversed the disqualification imposed by the claims adjudicator (Plain-

tiff's Exhibit 4). The employer then appealed and the South Carolina Employment Security Commission,. after a hearing, imposed "a minimum degree of. disqualification" (five weeks) (Plaintiff's Exhibit 5). Significantly, the Commission found that "[t]he record shows that until someone in the shop filed a complaint about dust and heat conditions to the department administering the Occupational Health and Safety Act their relationship with the employer was quite satisfactory. However, the employer allegedly became very incensed and conducted a vigorous investigation in an effort to find out who made the complaint. Air conditioning in the shop was turned off and the men were no longer allowed to use the phone for personal calls."

## CONCLUSIONS OF LAW

1. This Court has jurisdiction over the subject matter and the parties to this action pursuant to § 11(c) of the Occupational Safety and Health Act of 1970 (29 U.S.C. § 651, *et seq.*), and 28 U.S.C. §§ 1337 and 1345. While the State of South Carolina is currently operating a "state plan" concerning health and safety standards approved by the Secretary of Labor pursuant to § 18 of the Act, the United States Department of Labor explicitly reserved the right to "continue to exercise authority, among other things, with regard to: Complaints filed with the U.S. Department of Labor about violations of the discrimination provisions of § 11(c) of the Act...." (29 C.F.R. § 1952.102).

■ 2. At all times relevant to this litigation, defendant has been an employer within the meaning of § 3(5) of the Act in that it employs employees within the meaning of § 3(6) of the Act in a business affecting commerce.

■ 3. The Court holds that the complaints filed by the three claimants were timely made. § 11(c)(2) of the Act provides that "[a]ny employee who believes that he has been discharged or otherwise discriminated against by any person in violation of this subsection may, within thirty days af-

ter such violation occurs, file a complaint with the Secretary [of Labor] alleging such discrimination." By interpretative regulation (issued pursuant to the authority found in § 8(g)(2) of the Act), the Secretary has provided at 29 C.F.R. § 1977.15(d)(3) that:

> [T]here may be circumstances which would justify tolling of the 30-day period on recognized equitable principles or because of strongly extenuating circumstances, e.g., where the employer has concealed, or misled the employee regarding the grounds for discharge or other adverse action; where the employee has, within the 30-day period, restored in good faith to grievance-arbitration proceedings under a collective bargaining agreement *or filed a complaint regarding the same general subject with another agency;* where the discrimination is in the nature of a continuing violation. In the absence of circumstances justifying a tolling of the 30-day period, untimely complaints will not be processed. [Emphasis added].

While the complaint to the Secretary on behalf of the three claimants was not filed within 30 days of the discharge, two complaints were made to the South Carolina Department of Labor within 30 days. First, on June 30, 1977, the day of the discharge, Conciliator Rowland converted the earlier harassment complaint into a discharge complaint. Cf. *Oubichon v. North American Rockwell Corp.,* 482 F.2d 569, 571 (9th Cir.1973); *Kirkland v. Buffalo Board of Education,* 622 F.2d 1066, 1068 (2nd Cir. 1980). Then, by letter dated July 14, 1977, and received on July 21, 1977, a complaint on behalf of all three men was filed directly related to the discharge. These complaints clearly fall within the tolling provision for filing with another agency and they undisputedly regarded the same general subject—the discharges. The conciliation effort failed as of August 19, 1977, and all parties were so informed by letter of that date. The complaint to the Secretary of Labor was received on September 6, 1977, making the complaint timely. Moreover, defendant has not claimed, much less proven, that it has in any way been prejudiced by the September 6, 1977, filing with the U.S. Department of Labor.

■ 4. The Court also holds that 29 C.F.R. § 1977.15(d) is a valid and enforceable interpretative regulation. As was held in *Marshall v. N.L. Industries, Inc.,* 618 F.2d 1220, 1224 (7th Cir.1980): "The Secretary's interpretations of the Act are entitled to great weight and are controlling if reasonable." The reasonableness of providing equitable tolling in situations such as here is clear beyond peradventure, particularly with such a short (30 days) filing requirement. Therefore, just as is true in actions under the Age Discrimination in Employment Act and Title VII of the Civil Rights Act of 1964, the Court holds that the filing limit here (30 days) is not jurisdictional, but is a condition precedent—more in the nature of a statute of limitation—which is subject to equitable tolling. See generally *Zipes v. Trans World Airlines, Inc.,* 455 U.S. 385, 102 S.Ct. 1127, 71 L.Ed.2d 234 (1982); *Coke v. General Adjustment Bureau, Inc.,* 640 F.2d 584 (5th Cir.1981; en banc). Indeed, the two courts which have dealt with 29 C.F.R. § 1977(d)(3) have upheld its validity, but ruled against the employee on factual grounds. In *Marshall v. Certified Welding Corp.,* 7 OSHC 1069 (10th Cir. 1978), the Tenth Circuit, after citing the regulation, held that the employee's complaints to the State of Wyoming "clearly did not deal with the same 'general subject' matter in terms of factual causation relating to Jenkins' job termination." No such problem exists here. And in *Usery v. Northern Tank Line, Inc.,* 4 OSHC 1964 (D.Mont.1976), the court, after again citing 29 C.F.R. § 1977(d)(3), found that the facts did not support equitable tolling. The facts in this case unequivocally support equitable tolling and a finding of timely filing with the Secretary of Labor.

5. Section 11(c)(1) of the Act "prohibits an employer from discharging or discriminating against any employee who exercises 'any right afforded by' the Act" (*Whirlpool Corp. v. Marshall,* 445 U.S. 1, 3, 100 S.Ct. 883, 886, 63 L.Ed.2d 154 (1980)) and is comparable in scope and purpose to the National Labor Relations Act's provision protect-

ing concerted activity by employees concerning safety and health complaints. See in particular *N.L.R.B. v. Washington Aluminum Co.,* 370 U.S. 9, 82 S.Ct. 1099, 8 L.Ed.2d 298 (1962), which presented a factual situation quite similar to the instant case. See also *Newport News Shipbuilding & Dry Dock v. N.L.R.B.,* 631 F.2d 263, 268 (4th Cir.1980).

■ 6. This "safety legislation is to be liberally construed to effectuate the congressional purpose." (*Whirlpool Corp. v. Marshall, supra,* 445 U.S. at 13, 100 S.Ct. at 891).

■ 7. The filing of the safety and health complaint with the South Carolina Department of Labor by Walker and the complaints made by Walker, Upton and Foster to management concerning the unventilated welding fumes are protected activities for which an employee cannot be discharged or discriminated against by his employer. See *Marshall v. Springville Poultry Farm, Inc.,* 445 F.Supp. 2 (M.D.Pa. 1977); *Marshall v. Commonwealth Aquarium,* 469 F.Supp. 690 (D.Mass.1979), aff'd. 611 F.2d 1 (1st Cir.1979); *Marshall v. P & Z Company, Inc.,* 1978 CCH OSHD ¶ 22,579 (D.D.C.1978); *Marshall v. Power City Electric, Inc.,* 1979 CCH OSHD ¶ 23,947 (E.D. Wash.1979).

8. " 'It is settled in this circuit, and most of the others, that it is enough [to find a discriminatory or retaliatory discharge] that a discriminatory motive was a factor in the employer's decision' " to discharge. *N.L.R.B. v. Kiawah Island Coal Co.,* 650 F.2d 485, 490 (4th Cir.1981), citing *Neptune Water Meter Co. v. N.L.R.B.,* 551 F.2d 568, 569 (4th Cir.1977). See also *J.P. Stevens & Co., Inc. v. N.L.R.B.,* 638 F.2d 676, 681 (4th Cir.1980).

9. "Direct evidence of motive rarely exists. Inferences from the evidence almost universally are the only way of determining motive." (*Polynesian Cultural Center, Inc. v. N.L.R.B.,* 582 F.2d 467, 473 (9th Cir. 1978)); *Abilene Sheet Metal, Inc. v. N.L.R.B.,* 619 F.2d 332, 338–339 (5th Cir.1980); *Head Division, AMF, Inc. v. N.L.R.B.,* 593

F.2d 972, 975 (10th Cir.1979); *Marshall v. Chapel Electric Co.,* 1980 CCH OSHD ¶ 24,157 at page 29,363 (S.D.Ohio 1980).

10. In this case, defendant attempts to justify the discharge of the three employees because on one occasion two took an extended lunch break without permission (actually two hours) while one was late returning from lunch by one hour and 20 minutes. However, the Court concludes that this reason is a mere pretext which does not disguise the retaliatory motive of Mr. Koch:

(a) There was no written company policy concerning tardiness or discipline for being tardy prior to June 30, 1977, and no oral policy had been communicated to the employees except that time off the clock would be liberally granted if permission was requested. Even under the company's rules, established in July 1977, after the discharges, which admittedly were more strict than any in existence at the time of the discharges, the actions of the three employees would have subjected them only to a warning. See *N.L.R.B. v. Buddy Schoellkopf Products, Inc.,* 410 F.2d 82, 85 (5th Cir.1969); *Edgewood Nursing Center, Inc. v. N.L.R.B.,* 581 F.2d 363, 369 (3rd Cir.1978); *N.L.R.B. v. Master Slack,* 618 F.2d 6, 8 (6th Cir.1980); *N.L.R.B. v. Garry Mfg. Co.,* 630 F.2d 934, 945 (3rd Cir.1980). Moreover, there was no prior enforcement of any rule on tardiness nor any prior warnings to the discharged employees. See *N.L.R.B. v. Daylin, Inc.,* 496 F.2d 484, 488 (6th Cir.1974); *N.L.R.B. v. Warren L. Rose Castings, Inc.,* 587 F.2d 1005, 1008 (9th Cir.1978); *N.L.R.B. v. Midtown Service Co.,* 425 F.2d 665, 670 (2nd Cir.1970), and the company chose to apply the capital punishment of industrial jurisprudence—discharge—to an acknowledged first offense, which, by itself, was not particularly grave or serious. See *N.L.R.B. v. Southern Electronics Co.,* 430 F.2d 1391, 1393 (6th Cir.1970). In fact, the three discharged employees were not given an opportunity to explain their version of the events of June 29, 1977 directly to Mr. Koch, the person who made the exclusive decision to discharge them. See *N.L.R.B. v. Buddy Schoellkopf Products, Inc., supra,*

410 F.2d at 85; *N.L.R.B. v. Tamper, Inc.,* 522 F.2d 781, 791 (4th Cir.1975).

(b) The actions taken against Upton, Foster and Walker were selective and unevenly applied. Mr. Mesardjian, who had a record of tardiness in the past, was not discharged, although he clocked in the same as Walker, who was fired. Nor was Mesardjian discharged two months later after being in continued violation of the newly promulgated rules on tardiness. "The essence of discrimination . . . is treating like cases differently" (*Midwest Regional Joint Bd. v. N.L.R.B.,* 564 F.2d 434, 442 (D.C.Cir.1977)). Indeed, "enforcement of an otherwise valid rule only against those engaged in [protected] activities is discriminatory" (*N.L.R.B. v. Heck's, Inc.,* 386 F.2d 317, 320 (4th Cir. 1967)); *N.L.R.B. v. Big Three Ind. Gas & Equipment Co.,* 579 F.2d 304, 312–312 (5th Cir.1978); *Brown v. A.J. Gerrard Mfg. Co.,* 643 F.2d 273, 276 (5th Cir.1981); *Marshall v. P & Z Company, Inc., supra.*

(c) The defendant has not produced evidence that it has treated similar situations in a like manner. "A company can best show that improper motives did not move it to discharge a complaining employee by adducing proof that other employees were discharged for the same reason that the complaining employee was discharged, when there is no suggestion that the other employees were discharged for an improper motive" (*Abilene Sheet Metal, Inc. v. N.L.R.B., supra,* 619 F.2d at 339).

(d) Mr. Crocker, the foreman of the three men, did not want them discharged. See *N.L.R.B. v. Plant City Steel Corp.,* 331 F.2d 511, 515 (5th Cir.1964).

(e) Mr. Koch ordered that the telephone privileges accorded the men in the back be taken away because he believed the OSHA complaint had been made on the company telephone, and in ordering the air conditioning turned off, which made working conditions very uncomfortable, he made it appear that it was in retaliation for the OSHA complaint.

(f) Mr. Koch went to great lengths to find out which specific employee filed the OSHA complaint by interrogating and threatening the employees and calling the South Carolina Department of Labor. See *N.L.R.B. v. Davis,* 642 F.2d 350, 353 (9th Cir.1981); *Hamilton Avnet Electronics,* 240 NLRB 781, 788–789 (1979). Cf. *J.P. Stevens & Co., Inc. v. N.L.R.B., supra,* 638 F.2d at 683. Additionally, his previously cordial relationship with the three men became very cool after the OSHA inspection and he told Mr. Mesardjian on the day of the firings that he had had enough from the three men.

■ 11. Based on all the credible evidence, both direct and circumstantial, and the reasonable inferences therefrom, it is established that John Upton, Olan Foster and Douglas Walker were discharged on June 30, 1977, in substantial part, if not wholly, because of their engagement in activity protected by the Act. In any event, "a business reason cannot be used as a pretext for a discriminatory firing" (*Marshall v. Chapel Electric Co., supra; J.P. Stevens & Co., Inc. v. N.L.R.B., supra*). Moreover, defendant has not demonstrated that the three employees would have been fired in the absence of the protected activity. See *Marshall v. Commonwealth Aquarium, supra,* 469 F.Supp. at 693.

12. While Upton, Foster and Walker engaged in protected activity by complaining to management about the welding fumes, they are also protected because it is the Court's conclusion that their discharge came about as a result of Mr. Koch's inability to pinpoint the one employee who actually filed the OSHA complaint. Koch accordingly fired all three suspected "culprits", notwithstanding his mistake as to Upton and Foster. Such an approach brings the "innocent" parties under the umbrella of protected activity. See *N.L.R.B. v. Hertz Corp.,* 449 F.2d 711, 714–715 (5th Cir.1971); *Hamilton Avnet Electronics,* 240 NLRB 781, 791–792 (1979); *Metropolitan Orthopedic Association, P.C.,* 237 NLRB 427, 429 (1978).

■ 13. This action is not barred by either the doctrine or *res judicata* or collateral estoppel (*United States v. Utah Construction & Mining Co.,* 384 U.S. 394, 86

S.Ct. 1545, 16 L.Ed.2d 642 (1966)). The administrative agency (here the South Carolina Department of Labor) must be "acting in a judicial capacity ... resolv[ing] disputed issues of fact properly before it which the parties have had an adequate opportunity to litigate ... [in that] both parties had a full and fair opportunity to argue their version of the facts and an opportunity to seek court review of any adverse findings" (384 U.S. at 422, 86 S.Ct. at 1560). See also *Anderson v. Babb,* 632 F.2d 300, 306–307 n. 3 (4th Cir.1980). Foster, Upton and Walker were not afforded "a 'fair opportunity procedurally, substantively and evidentially' to litigate the issue raised in the present case" before the State of South Carolina (*State of North Carolina v. Chas Pfizer & Co., Inc.,* 537 F.2d 67, 73 (4th Cir.1976), cert. den. 429 U.S. 870, 97 S.Ct. 183, 50 L.Ed.2d 150 (1977)). Indeed, the "administrative hearing approved by the Supreme Court in *Utah Construction* provided a 'fulldress adversary proceeding, with testimony, cross-examination, exhibits, briefs and arguments'" (*Nasem v. Brown,* 595 F.2d 801, 807 (D.C.Cir. 1979)), none of which were available here. Indeed, it is inconceivable that defendant has asserted that this unsuccessful conciliation effort could take on the trappings of *res judicata* or collateral estoppel. Cf. *Cunegin v. Zayre Dept. Store,* 437 F.Supp. 100, 103–104 (E.D.Wis.1977).

14. The Court ascribes no weight to the conclusion of the South Carolina Employment Security Commission that "in view of all the circumstances a minimum degree of disqualification is in order," because the unemployment compensation proceeding is not concerned with whether the employer violated federal law. Indeed, there is far less reason to give weight to an unemployment compensation decision than to an arbitration decision involving the same parties, yet it has been held that "deference to an arbitrator's decision ... would be inconsistent with the statutory purpose [of this Act]" (*Marshall v. N.L. Industries, Inc., supra,* 618 F.2d at 1223).

15. As a result of defendant's proscribed conduct, it is required to reimburse Mr. Upton the amount of $19,948.95, Mr. Foster the amount of $10,849.74, and Mr. Walker the amount of $1,920.00 together with prejudgment interest for each, to make the employees whole (see *Hembree v. Georgia Power Co.,* 637 F.2d 423, 429–430 (5th Cir. 1981)), at the rate of 12% per annum. See *Olympic Medical Corp.,* 250 NLRB No. 211, 104 LRRM 1325 (1980), wherein the National Labor Relations Board set forth the rationale for a 12% interest award. See also *North Cambria Fuel Co., Inc. v. N.L.R.B.,* 645 F.2d 177, 181 (3rd Cir.1981); *E.E.O.C. v. Pacific Press Pub. Ass'n.,* 482 F.Supp. 1291, 1319–1320 (N.D.Calif.1979); *Marshall v. Burger King Corp.,* 509 F.Supp. 353 (E.D.N.Y.1981).

■ 16. No reduction of the back pay awards is due for state unemployment compensation monies collected by the employees. See *E.E.O.C. v. Ford Motor Co.,* 645 F.2d 183, 195–196 (4th Cir.1981), citing *N.L.R.B. v. Gullett Gin,* 340 U.S. 361, 71 S.Ct. 337, 95 L.Ed. 337 (1951); see also *Florence Printing Co. v. N.L.R.B.,* 376 F.2d 216, 219 (4th Cir.1967); *Marshall v. Wallace Bros. Mfg. Co.,* 1979 CCH OSHD ¶ 23,251 at page 28,126 (M.D.Pa.1978).

■ 17. There has been no failure to mitigate by any of the discharged employees. "Where backpay is in dispute, the sole burden on the [employees] is to show the gross backpay due [them]" (*N.L.R.B. v. Pilot Freight Carriers, Inc.,* 604 F.2d at 377). The complainants have done this here. "Failure to mitigate damages is an affirmative defense, the burden of which is not met by an employer's proof that the employee failed to find interim employment" (*Peel v. Florida Dept. of Transp.,* 500 F.Supp. 526, 528 (N.D.Fla.1980)). "The universal rule is that an employee's damages will be mitigated only if *the employer proves* that similar employment opportunity was available" (*Ballard v. El Dorado Tire Co.,* 512 F.2d 901, 905 (5th Cir.1975)); [emphasis added], and the employer must prove "with reasonable certainty that employment was available in the *specific line of work* in which the employee was engaged" (*id* at 906; emphasis in original). See also

*Williams v. Albemarle City Board of Education,* 508 F.2d 1242, 1243 (4th Cir.1974), *en banc; Hegler v. Board of Ed. of Bearden Sch. District,* 447 F.2d 1078, 1081 (8th Cir. 1971), wherein it was held that the employer "has to show not only that the [employee] failed to use reasonable care and diligence, but that there were jobs available which [the employee] could have discovered and for which [the employee] was qualified."

As was true in *Eckerd v. Indian River School District,* 475 F.Supp. 1350, 1365 (D.Del.1979): "Defendants ... have introduced absolutely no evidence that there were jobs available which [these employees] could have discovered and for which [they were] qualified, although it was clearly [the employer's] burden to prove failure to mitigate damages." See also *Peel v. Florida Dept. of Transp., supra.* To be sure, " '[a]ll evidence in mitigation is for a defendant to give' " (*Ballard v. El Dorado Tire Co.,* 512 F.2d at 905). See also *Abron v. Black & Decker Mfg. Co.,* 439 F.Supp. 1095, 1115 (D.Md.1977); *Inda v. United Air Lines, Inc.,* 405 F.Supp. 426, 434 (N.D.Calif.1975), aff'd. 565 F.2d 554 (9th Cir.1977), *cert. den.* 435 U.S. 1007, 98 S.Ct. 1877, 56 L.Ed.2d 389 (1978). Here, the record clearly establishes that the employees made reasonable efforts to find work and that nothing in their specific line of work was immediately available. The fact that they all looked for work at the same companies only reinforces their diligence, for clearly there were only a limited number of places that employ machinists in the Spartanburg area.

18. Defendant, under the circumstances shown here, are hereby permanently enjoined from violating § 11(c) of the Act.

19. Since none of the affected employees wishes to be reinstated, no order in that respect is required to make them whole.

20. Defendant's personnel records of John Upton, Olan Foster and Douglas Walker shall be expunged of any adverse references to their termination from defendant's employment on June 30, 1977.

IT IS SO ORDERED.