Ray MARSHALL, Secretary of
Labor, Plaintiff,

v.

COMMONWEALTH AQUARIUM,
Defendant.

Civ. A. No. 77–338–C.

United States District Court,
D. Massachusetts.

May 10, 1979.

Albert H. Ross, Regional Solicitor, John S. Casler, Atty., U. S. Dept. of Labor, Boston, Mass., for plaintiff.

Roy D. Toulan, Jr., Gerald Pu Tishler, Brown, Rudnick, Freed & Gesmer, Boston, Mass., for defendant.

## OPINION

CAFFREY, Chief Judge.

This case arises from the discharge on May 15, 1976 of Jeffrey Boxer from his position as manager of Commonwealth Aquarium, a pet store located in Brookline, Massachusetts. On May 26, 1976 Boxer filed a complaint with the Secretary of Labor alleging that he was terminated by the defendant in retaliation for the exercise of his rights under the Occupational Safety and Health Act, 29 U.S.C.A. § 651 *et seq.* (OSHA). Boxer's complaint to the Secretary claimed that his employment was terminated because he had reported to the National Institute of Occupational Safety and Health his fear that a potential health hazard existed at Commonwealth Aquarium. The Secretary determined that Boxer had indeed been discharged as a result of exercising his rights under OSHA and brought the instant action against the defendant in 1977. The jurisdiction of this Court is invoked under 29 U.S.C.A. § 660(c)(2).

In August, 1975 Boxer was hired to manage defendant's Brookline store and was trained for that position by Richard Lerner, his immediate supervisor. The parties agree that from August 1975 to December 1975 Lerner and Boxer enjoyed an excellent working relationship. Lerner often expressed his satisfaction with Boxer's performance and Boxer received a substantial pay raise a few months after he had begun to work for the defendant. In fact, Lerner testified that he gave Boxer a silk tie as a Christmas gift.

It is in regard to the period following Christmas 1975 that the testimony becomes widely divergent. Lerner testified that there was a sudden and drastic change in Boxer's performance and that as a result of

Boxer's tardiness, absenteeism, and mismanagement, their relationship deteriorated rapidly. However, although Lerner testified that he was seriously dissatisfied with Boxer's performance, he also testified that he kept hoping that Boxer would "return to the Jeffrey that [he] had once hired." There was no evidence tending to prove that he had ever considered terminating Boxer prior to May 1976.

Boxer testified and I find that the silk tie had been presented to him by Lerner not as a Christmas gift in December of 1975 but at a celebration of Boxer's birthday at Lerner's home on April 18, 1976 at which time, according to Boxer, Lerner told Boxer that he had a good future working for the defendant. Springer, a former employee of defendant, testified and I find that Lerner had continued to express his satisfaction with Boxer's work up to two weeks before the incidents culminating in Boxer's discharge.

I find that as late as mid-April 1976 the working relationship between Lerner and Boxer was good and that Lerner had no grounds for and had not considered discharging Boxer prior to May 1976.

In early May, 1976 Dr. Marjorie McMillan, a veterinarian at Angell Memorial Animal Hospital, performed an autopsy on a bird from Commonwealth Aquarium. The autopsy disclosed lesions which were highly suggestive of psittacosis, although no definite diagnosis could be made for three weeks. Psittacosis is a contagious respiratory ailment which affects birds and which when contracted by humans is potentially fatal.

A second bird acquired from the store about this time died with similar symptoms and four persons who had come in contact with the two birds thereafter contracted respiratory ailments.

Dr. McMillan called Boxer at Commonwealth Aquarium to warn him of the possible presence of psittacosis in his bird population and the doctor also informed him that, although her medical data was highly suggestive of psittacosis, the diagnosis was only tentative and would not be confirmed for several weeks. Boxer immediately checked all the birds in the store and saw no signs of sickness. He testified that he called Lerner to express his concern over the possible health hazard and was told to carry on with business as usual. Springer testified that he overheard a telephone conversation between Boxer and Lerner in which Boxer informed Lerner of a potential health hazard. Lerner refused to admit that such a problem existed.

The next morning, Boxer found the mate of one of the dead birds lying in its cage breathing very rapidly. He killed the bird and delivered it to an avian bacteriologist to be autopsied. Boxer later informed Lerner that there was a good chance that the third bird also had psittacosis. Boxer testified and I find that Lerner became angry and told Boxer that he should either continue to sell birds or he would be fired.

Boxer then began to add tetracycline to the birds drinking water and he contacted Dr. John Lewis, an employee of the National Institute of Occupational Safety and Health, to whom he explained the situation. As a result of that conversation, Dr. Lewis came to inspect the store.

Dr. Lewis recommended to both Lerner and Boxer that tetracycline-impregnated bird food [1] should be purchased and that the birds should be quarantined in a separate area. He suggested that if possible no birds be sold to the public. Lerner admitted that he spoke with Dr. Lewis and that although he had acknowledged Dr. Lewis' recommendations he did nothing to effectuate them. He testified that he examined the birds and believed them to be healthy. Boxer testified and I find that despite Dr. Lewis' advice he was told by Lerner to conduct business as usual. Boxer also testified and I find that no tetracycline-impregnated food was purchased.

Shortly thereafter Mr. Daley of the State Department of Labor told Lerner to buy masks for the employees to wear and the

---

1. Dr. Lewis testified that adding tetracycline to the birds' drinking water was inadequate.

health inspector for the Town of Brookline instructed Lerner to quarantine the birds, stop selling them to the public for a few days, and to put tetracycline in their water rather than in their food. It is obvious therefore that although the authorities conflicted as to the specific remedial measures called for, they all believed that a potential health hazard existed at Commonwealth Aquarium.[2] Lerner, however remained firm in insisting that the birds were healthy.

The birds were quarantined and Mr. Boxer left for his weekend off. Upon returning to work on Monday morning, he testified that he was told to conduct business as usual. When he discovered later that day that a bird had been sold in his absence over the weekend, he notified the Brookline health inspector who ordered the store closed.

Although Lerner testified that he never threatened to discharge anyone for refusing to carry on business as usual, Springer testified, and I find, that he was approached by Lerner at some point during early May 1976 as to the possibility of his (Springer's) assuming Boxer's managerial duties at Commonwealth Aquarium. At that time Lerner told Springer that Boxer was "causing problems" and that things were getting "blown out of proportion." Boxer was terminated within a week after the store was closed by health officials.

29 U.S.C.A. § 660(c)(1) provides:

No person shall discharge or in any manner discriminate against any employee because such employee has filed any complaint or instituted or caused to be instituted any proceeding under or related to this chapter or has testified or is about to testify in any such proceeding or because of the exercise by such employee on behalf of himself or others of any right afforded by this chapter.

It is undisputed that Boxer complained to an OSHA official about the potential health hazard at Commonwealth Aquarium, that Lerner knew of Boxer's complaint, and that Boxer was discharged shortly thereafter. It is necessary to determine therefore whether Boxer has met his burden and established that he was discharged because of that complaint.

In *Mount Healthy City School District Board of Education v. Doyle,* 429 U.S. 274 at 285–86, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977) the Supreme Court rejected a rule of causation which relied solely upon a determination of whether the protected activity had played a substantial part in the employer's decision, the rationale being that to apply such a rule would place the employee in a *better* position than if he had not engaged in the protected activity. The Court ruled that the right to engage in protected activity is sufficiently vindicated if the employee is placed in *no worse* a position than if he had not engaged in the protected activity.

In so ruling the Court stated that once the plaintiff establishes that his activity was protected and that the protected activity was a substantial factor in the employer's decision, the burden then shifts to the employer to establish by a preponderance of the evidence that it would have reached the same decision even in the absence of the protected conduct.[3] See also *Givhan v. Western Line Consolidated School District,* —— U.S. ——, 99 S.Ct. 693, 58 L.Ed.2d 619 (1979).

Applying that distribution of the burden to the facts of this case I rule that the plaintiff must prevail. Having in mind Lerner's claimed disbelief that a health hazard existed at Commonwealth Aquarium on

**2.** Although Dr. Lewis testified on deposition that a Mr. Lewis from the Department of Agriculture didn't want to exercise his power to close the shop, he also testified that Mr. Lewis' concern was limited to the protection of livestock and did not extend to the health of the employees or the public who might come in contact with the birds.

**3.** Compare the decisions of the Court of Appeals for the First Circuit in cases brought under Section 8(a)(3) of the National Labor Relations Act. *Liberty Mutual Ins. Co. v. NLRB,* 592 F.2d 595 (1st Cir. 1979); *Coletti Furniture, Inc. v. NLRB,* 550 F.2d 1292 (1st Cir. 1977); *NLRB v. Lowell Sun Publishing Co.,* 320 F.2d 835 (1st Cir. 1963).

 

May, 1976, his reluctance to cooperate with health officials, his resentment at their interference with his business activities and his belief that Boxer was overreacting, the fact that Boxer was discharged on May 15, 1976 and that Lerner had not considered discharging Boxer before May, 1976, I find that Boxer's complaint to OSHA in May, 1976 was a significant and substantial proximate causative factor for Lerner's decision to discharge him.

Apart from Lerner's testimony as to the deterioration of his relationship with Boxer prior to May 1976 which has been discussed and disbelieved above there is nothing in the record upon which the Court could base a finding that Lerner would have reached the same decision even in the absence of Boxer's complaints regarding the safety of his working conditions.

Lerner testified that the Friday after the store was closed down Boxer asked him if he could be laid off for the Summer so that he could do some fishing. Boxer's version of that conversation was that in light of Lerner's repeated threats to terminate his employment he was trying to ascertain whether he was to be fired or laid off so that he could determine whether he would be eligible for unemployment benefits. Furthermore, Lerner's contention that he decided to discharge Boxer because Boxer refused to work on a scheduled work day is unpersuasive. Boxer testified and I find that he never refused to come into the store when requested to do so.

I rule that after plaintiff established that improper motivation played a substantial part in Lerner's decision to discharge Boxer defendant failed to prove by a preponderance of the evidence that he would have discharged Boxer even in the absence of the protected activity.

I find that at the time he was terminated Boxer was being paid $245 per week and further find that despite his efforts to find another job he remained unemployed for a period of 68 weeks. But for the wrongful termination therefore Boxer would have earned $16,660 between May 15, 1976 and September 5, 1977. In the 68 weeks following the termination I find that he actually earned $1,400 which was supplemented by unemployment benefits of $2,380 which he collected at a rate of $85 per week for 7 months. I rule therefore that Boxer should recover damages in the amount of $12,880.