JOHN C. BROOKS, COMMISSIONER OF LABOR OF THE STATE OF NORTH CAROLINA, PLAINTIFF v. THE STROH BREWERY COMPANY, DEFENDANT

No. 8821SC899

(Filed 5 September 1989)

1. **Master and Servant § 10.2— retaliatory discharge—OSHANC complaint—summary judgment for defendant**

     Defendant was entitled to summary judgment as a matter of law in an action in which the Commissioner of Labor alleged that defendant discharged an employee, Nettles, in retaliation for filing a complaint about an unsafe working condition with the Occupational Health and Safety Division of the N.C. Department of Labor. The undisputed facts would permit the court to conclude as a matter of law that Nettles would have been discharged notwithstanding the OSHANC complaint. N.C.G.S. § 95-130(8), N.C.G.S. § 1A-1, Rule 56(c).

2. **Master and Servant § 10.2— retaliatory discharge—acceptance of multiplant grievance committee decision—bar to action**

     An action by the Commissioner of Labor alleging retaliatory discharge for reporting an unsafe working condition to the occupational safety and health division was not barred pursuant to N.C.G.S. § 95-36.8 by the employee's acceptance of a multiplant grievance committee determination because the multiplant grievance procedure was not arbitration as contemplated by the statute. However, the limited scope of the benefits sought (back pay for the period of the employee's suspension) makes this an action for private rather than public benefits and the Commissioner's action is therefore barred; the purpose of the antiretaliation statute is to avoid the chilling effect on employees' willingness to file complaints when those who do are disciplined or discharged under pretext, and that chilling effect can be neutralized effectively by a collective bargaining agreement grievance procedure. Summary judgment for defendant on that ground was therefore proper.

3. **Judgments § 37; Master and Servant § 10.2— action for retaliatory discharge—ESC determination of dismissal for misconduct—no collateral estoppel**

     Summary judgment on the basis of collateral estoppel was not proper where the Commissioner of Labor brought

**BROOKS v. STROH BREWERY CO.**

[95 N.C. App. 226 (1989)]

an action for the retaliatory discharge of an employee for filing a complaint with the occupational safety and health division of the North Carolina Department of Labor; the employee had filed a claim for unemployment compensation which had been rejected based on a determination of misconduct in failing to follow posted safety procedures; and the record shows that no evidence was presented on the issue of discriminatory treatment, that neither the ESC nor the superior court determined whether defendant had discriminated against the employee, and there was no indication that the appeals referee had even considered the question of retaliatory discharge.

APPEAL by plaintiff from *Rousseau (Julius A.), Judge.* Judgment entered 28 March 1988 in Superior Court, FORSYTH County. Heard in the Court of Appeals 16 March 1989.

This action was brought by the Commissioner of Labor pursuant to the Occupational Safety and Health Act of North Carolina (OSHANC), G.S. 95-126 *et seq.*, and arises from Edward Nettles' discharge as an employee of defendant The Stroh Brewery Company. Plaintiff contends that Nettles was discharged in retaliation for filing a complaint with the Occupational Safety and Health Division of the North Carolina Department of Labor (OSHD) about an unsafe working condition at defendant's Winston-Salem brewery.

In April 1983, Nettles, an electrician, complained to defendant's assistant manager for engineering, Harold Mann, concerning a safety hazard at an electrical control panel near a Dubru washer in the plant. These complaints were discussed with both the plant superintendent, Richard Graves, and the plant manager, Gray Wooten. Not being satisfied with the company's response, on 9 May 1983 Nettles filed a complaint with OSHD regarding the electrical control panel. On 26 May 1983 an OSHD inspector arrived at the brewery and inspected the electrical control panel. Subsequent to the inspection OSHD issued defendant a citation with a penalty relating to the electrical panel.

In November 1983 Nettles was transferred from the packaging plant to the brewhouse. On 19 January 1984, while working the third shift, Nettles failed in two separate situations to follow proper safety procedures in violation of defendant's safety policy. For these violations Nettles was placed on indefinite suspension on 20 January 1984. On 26 January 1984 a second level meeting was held to

inquire further into the 19 January incident. At this meeting, which was conducted by Don Steele, manager of industrial relations, Graves, Mann, Nettles and three union representatives were present. After this meeting Steele met with plant manager Wooten to discuss the meeting and conferred by telephone with corporate headquarters in Detroit. Steele then recommended that Nettles be terminated. The final decision was made by Wooten. Nettles was terminated 26 January 1984. On 1 February 1984 Nettles filed a complaint with OSHD alleging retaliatory discrimination.

Between the time Nettles filed his complaint with the North Carolina Department of Labor and the time this action was filed on 13 January 1987, Nettles' termination had been reduced to six months suspension without pay through the collective bargaining agreement grievance process. Plaintiff's complaint asked the court to award back pay and lost benefits to Nettles and to enjoin defendant from discriminating against workers making safety complaints in violation of G.S. 95-130(8). In the court below summary judgment was entered for defendant.

*Attorney General Lacy H. Thornburg, by Assistant Attorney General Rodney S. Maddox and Associate Attorney General Robert J. Blum, for plaintiff-appellant.*

*Womble Carlyle Sandridge & Rice, by Mark N. Poovey, for defendant-appellee.*

PARKER, Judge.

On appeal plaintiff argues that the trial court erred in granting summary judgment on any one of the three grounds asserted by defendant in that (i) plaintiff forecast evidence showing a genuine issue of material fact as to defendant's motive in discharging Nettles, (ii) Nettles' acceptance of an arbitration award did not preclude the plaintiff from bringing this action, and (iii) plaintiff is not estopped by the Employment Security Commission's findings in Nettles' proceeding for unemployment benefits. We address separately each of plaintiff's contentions.

I.

[1] General Statute 95-130 sets forth the rights and duties of employees under the Occupational Safety and Health Act of North Carolina. The statute states, in pertinent part, the following:

## BROOKS v. STROH BREWERY CO.

[95 N.C. App. 226 (1989)]

No employee shall be discharged or discriminated against because such employee has filed any complaint or instituted or caused to be instituted any proceeding or inspection under or related to this Article or has testified or is about to testify in any such proceeding or because of the exercise by such employee on behalf of himself or others of any right afforded by this Article.

G.S. 95-130(8).

The Occupational Safety and Health Act of North Carolina, G.S. 95-126 *et seq.*, is closely patterned after the Federal Occupational Safety and Health Act of 1970 (OSHA), 29 U.S.C. §§ 651 *et seq.*, and G.S. 95-130(8) is virtually identical to the federal act's provision prohibiting retaliatory discharge. *See* 29 U.S.C. § 660(c). The primary purpose of both the Federal and State Occupational Safety and Health Acts is to assure safe and healthful working conditions for workers. *See Marshall v. Intermountain Elec. Co., Inc.*, 614 F.2d 260, 262 (10th Cir. 1980). The primary purpose of both the federal and state provisions prohibiting retaliatory discrimination is to ensure that employees are not discouraged from reporting violations of the Act. *See id.; Donovan v. R.D. Andersen Const. Co., Inc.*, 552 F. Supp. 249, 251, 66 A.L.R. Fed. 644, 647 (D. Kan. 1982); *Marshall v. Springville Poultry Farm, Inc.*, 445 F. Supp. 2, 3 (M.D. Pa. 1977). North Carolina has received approval from the federal government to administer its own occupational safety and health program. *See* 29 U.S.C. § 667; 29 C.F.R. §§ 1952.150-1952.155. Realizing the significant similarities between OSHANC and the federal act, this Court has, in the past, looked for guidance to federal court decisions interpreting OSHA. *See Brooks, Comr. of Labor v. Butler*, 70 N.C. App. 681, 321 S.E.2d 440 (1984), *disc. rev. denied and appeal dismissed*, 313 N.C. 327, 329 S.E.2d 385 (1985). Since this is the first action brought by the Commissioner to enforce G.S. 95-130(8), we look to federal cases interpreting the analogous federal statute.

Summary judgment is appropriate only where the evidence presented to the court shows both a lack of genuine issue of material fact and movant's entitlement to judgment as a matter of law. *Bank v. Gillespie*, 291 N.C. 303, 310, 230 S.E.2d 375, 379 (1976); G.S. 1A-1, Rule 56(c). In ruling on a motion for summary judgment the court must closely scrutinize the movant's materials while it regards with indulgence the non-movant's materials. *Hillman v.*

BROOKS v. STROH BREWERY CO.

[95 N.C. App. 226 (1989)]

*United States Liability Ins. Co.*, 59 N.C. App. 145, 148, 296 S.E.2d 302, 304-305 (1982), *disc. rev. denied*, 307 N.C. 468, 299 S.E.2d 221 (1983). In order to survive a motion for summary judgment, the Commissioner need only forecast evidence showing that he can make a *prima facie* case of retaliatory discrimination at trial. *See Dickens v. Puryear*, 302 N.C. 437, 453, 276 S.E.2d 325, 335 (1981). Moreover, the non-movant need only present evidence sufficient to rebut the movant's showing of either an affirmative defense or nonexistence of an essential element of the claim. *Id.*

As a general rule summary judgment in favor of the party bearing the burden of proof is rarely proper. *Blackwell v. Massey*, 69 N.C. App. 240, 243, 316 S.E.2d 350, 352 (1984). *See also Valdese General Hospital, Inc. v. Burns*, 79 N.C. App. 163, 164-65, 339 S.E.2d 23, 25 (1986); *Almond Grading Co. v. Shaver*, 74 N.C. App. 576, 578, 329 S.E.2d 417, 418 (1985). Additionally, defendant has a particularly difficult burden in establishing his right to summary judgment in a case in which plaintiff's claim is dependent upon proof that defendant acted with a particular state of mind. *Burrow v. Westinghouse Electric Corp.*, 88 N.C. App. 347, 351, 363 S.E.2d 215, 218, *disc. rev. denied*, 322 N.C. 111, 367 S.E.2d 910 (1988); *Valdese General Hospital, Inc. v. Burns*, 79 N.C. App. at 165, 339 S.E.2d at 25; *Edwards v. Bank*, 39 N.C. App. 261, 269, 250 S.E.2d 651, 657 (1979).

For the court to hold that defendant has violated the statutory prohibition against retaliatory discrimination, the court must find (i) that the employee/complainant engaged in protected activity, (ii) that the protected activity was a substantial causative factor in the employee's termination, and (iii) that the employer has not shown by a preponderance of the evidence that it would have treated the employee/complainant in the same manner in the absence of protected activity. *See Marshall v. Commonwealth Aquarium*, 469 F. Supp. 690 (D. Mass.), *aff'd*, 611 F.2d 1 (1st Cir. 1979) (applying 29 U.S.C. § 660(c)). At trial once the plaintiff has shown that the employee's activities were protected and were a substantial factor in the employer's decision, the burden shifts to defendant to show that the same decision would have been made if the employee had not engaged in the protected activity. *Marshall v. Commonwealth Aquarium*, 469 F. Supp. at 692. *See also Mt. Healthy City Board of Ed. v. Doyle*, 429 U.S. 274, 285-87, 97 S.Ct. 568, 575-76, 50 L.Ed.2d 471, 482-84 (1977) (shifting burden to defendant where protected activity implicated first amendment right to freedom of speech),

BROOKS v. STROH BREWERY CO.

[95 N.C. App. 226 (1989)]·

*quoted in Marshall v. Commonwealth Aquarium*, 469 F. Supp. at 692. *Accord NLRB v. Transportation Mgmt. Corp.*, 462 U.S. 393, 103 S.Ct. 2469, 76 L.Ed.2d 667 (1983) (burden shifts to employer in context of retaliatory discharge for union activities under 29 U.S.C. § 158(a)(3) ). *But see, Dunlop v. Bechtel Power Corp.*, 1978 O.S.H. Dec. (CCH) ¶ 22,711 (M.D. La. 1977).

In the present case there is no question, and defendant has not contested the fact, that Nettles' 23 April 1983 complaint to his employer and Nettles' filing of the OSHANC claim on 9 May 1983 were protected activities within the scope of the legislation. G.S. 95-130; 29 U.S.C. § 660. *See also, e.g., Donovan v. George Lai Contracting, Ltd.*, 629 F. Supp. 121 (W.D. Mo. 1985) (OSHA complaint); *Donovan v. Diplomat Envelope Corp.*, 587 F. Supp. 1417 (E.D.N.Y. 1984), *aff'd*, 760 F.2d 253 (2d Cir. 1985) (complaint to union); *Donovan v. Freeway Const. Co.*, 551 F. Supp. 869 (D.R.I. 1982) (OSHA complaint); *Donovan v. Commercial Sewing, Inc.*, 562 F. Supp. 548 (D. Conn. 1982) (OSHA complaint); *Donovan v. R.D. Andersen Const. Co., Inc.*, 552 F. Supp. 249 (D. Kan. 1982) (conversation with reporter); *Donovan v. Peter Zimmer America, Inc.*, 557 F. Supp. 642 (D.S.C. 1982) (OSHA complaint); *Marshall v. Power City Electric, Inc.*, 1979 O.S.H. Dec. (CCH) ¶ 23,947 (E.D. Wash. 1979) (oral complaint to employer); *Marshall v. Commonwealth Aquarium*, 469 F. Supp. at 690 (OSHA complaint); *Marshall v. P & Z Company, Inc.*, 1978 O.S.H. Dec. (CCH) ¶ 22,579 (D.D.C. 1978) (complaint to employer and outside agencies); *Marshall v. Springville Poultry Farm, Inc.*, 445 F. Supp. at 2 (complaint to employer); *Dunlop v. Hanover Shoe Farms, Inc.*, 441 F. Supp. 385 (M.D. Pa. 1976) (complaint about working conditions made to legal services attorney).

The question then is whether, on the undisputed facts in the record, defendant has demonstrated as a matter of law that Nettles would have been discharged even if he had not filed the complaint concerning the electrical panel with the Commissioner of Labor. During his shift on 18-19 January 1984, Nettles disregarded company safety policy thereby creating two potentially life-threatening situations. The first incident occurred when Nettles, who had been working on a motor on the #15 fermenting tank in the brewhouse, was called to a higher priority job assignment. At this time Nettles merely disconnected the wires from the motor and laid them on top of the fermenting tank. Company safety procedure required Nettles either to place a lock to secure the disconnection or to

remove the fuses. The second incident occurred in the "Murphy Products" area of the plant, where employees frequently use water in proximity to the motors. Nettles temporarily hooked up a motor using only electrical tape, rather than securing the conduit with a locknut so that the conduit would be watertight.

Initially, we recognize that there is a dispute in the evidence as to whether plant manager Wooten knew about Nettles' OSHANC complaint when he made the decision to terminate Nettles. Although Wooten denied that he knew that Nettles had filed the complaint, reports prepared during the investigation of Nettles' 19 January 1984 safety violations contain a statement concerning Nettles' OSHANC complaint. Since Wooten was apprised of the information contained in these reports by Steele, the inference could be drawn that Wooten knew that Nettles had filed the OSHANC complaint in May 1983. Therefore, for purposes of summary judgment we must accept as true that Wooten knew that Nettles filed the OSHANC complaint. Similarly, based on the affidavits in the record, we must accept as true that other employees, with their supervisor's knowledge, had violated defendant's safety rules concerning lock-out and hold tag procedures and were not disciplined.

Even accepting these facts as true, the record, in our view, still discloses that defendant has met its burden of showing that Nettles would have been discharged in the absence of his protected activity. The undisputed facts show that on the morning of 19 January 1984, Mann received a call from Buddy Amburn, an employee on first shift, who advised that a safety hazard had been created by the way the flexible conduit had been connected to the junction box on a motor that had been replaced on the third shift in the "Murphy Products" area. Nothing in the record in any way suggests that Amburn had been told to check or report on Nettles' work. From all that appears of record, Amburn's call to Mann was an unsolicited report of unworkmanlike work that had created an unsafe condition. The record also reflects that the first report of the failure to lock-out on the #15 fermenting tank was made by an employee, Wayne Myers, to Ted Holcomb, an electrical supervisor, who reported the incident to Mann. Although the record does suggest some friction between Holcomb and Nettles, the tension was in no way connected with Nettles' filing the OSHANC complaint. The record is devoid of any suggestion that these reports to Mann on 19 January 1984 were instigated by Mann or any other supervisor or were the product of any concerted effort to

BROOKS v. STROH BREWERY CO.

[95 N.C. App. 226 (1989)]

"get" Nettles in retaliation for filing an OSHANC complaint in May 1983.

The fact is undisputed that prior to filing the OSHANC complaint, Nettles had requested that he be transferred out of the brewhouse because he was not confident in his ability to handle the job. Although plaintiff implies that Nettles was transferred from the packaging division back to the brewhouse in retaliation for filing the OSHANC complaint, the undisputed evidence in the record is that Nettles requested that he be transferred back to the brewhouse so that he could obtain weekend overtime.

The record also discloses that Steele made the recommendation that Nettles be terminated after this recommendation was cleared with corporate headquarters. On deposition Steel testified:

Q  Why did you recommend that Mr. Nettles be terminated?

A  Essentially for two reasons: Number one, the gravity of his actions, the fact that he had, in fact, created not one, but two situations that were literally life threatening. And the second part was during all of the discussions that Harold and I had with Mr. Nettles, he never once admitted that he had done anything wrong, that his actions were totally proper and he would probably do it again the same way, and we couldn't live with that.

Q  Was Mr. Nettles — is it your understanding that Mr. Nettles was terminated solely for not following the lock-out procedure?

A  No, that's not my understanding.

Q  What is your understanding in that regard?

A  He was terminated for not following the lock-out procedure on the No. 15 fermenting tank, but his job performance and the way that he left the Murphy Products motor was also a very serious safety function.

Q  Did that Murphy Product situation involve the lockout procedure?

A  It was an issue during the time he was working, but it's when he walked away without telling me about it was the sin.

Then on redirect examination by the Commissioner's counsel, Steele testified:

Q   If, in your opinion, Mr. Nettles had quote, "admitted doing something wrong," would it have changed your determination or your recommendation that he be discharged?

A ` I don't know that it would have changed it from discharge, no, but his lack of admitting that he had done anything wrong sealed it.

At the 26 January 1984 meeting to review Nettles' indefinite suspension, at which company representatives and three union representatives were present, the following exchange took place between Steele and Nettles:

Nettles: I want to say I made that motor safe for me to work on. I put the wires up under the cat walk where nobody would mess with them.

Steele: But don't you see Ed, someone did mess with them. The mechanics handled the wires and put them in the motor.

Nettles: That's not their job.

Steele: And because it's not their job they should die?

Nettles: If you go f_____ around in a panel you should die.

Steele: This meeting is over if no one has anything else to say. If you think of anything, let me know.

Further, in his report the OSHD investigating officer, after opining that Nettles would not have been discharged in the absence of the protected activity, then stated: "Nevertheless, this investigation failed to produce any real evidence (time, place, etc.) like Nettles' case wherein an employee failed to follow the lock-out procedure placing himself or others in danger who was not punished after discovery by management." The investigator's report also indicates that, "Nettles' method of safeproofing against accidental electrical shock or electrocution was irresponsible and unacceptable with regard to electrical codes and federal/state safety regulations."

Finally, the record reflects that Nettles was only an average electrician, requiring more assistance than most even after the normal training period. Nettles had also had at least one other disciplinary action, the nature of which is not disclosed in the record.

The test adopted in federal OSHA retaliatory discharge cases was enunciated in *Mt. Healthy City Board of Ed. v. Doyle*, 429

U.S. 274, 97 S.Ct. 568, 50 L.Ed.2d 471, a case involving first amendment protected activity. Justice Rehnquist, delivering the opinion of the Court, stated:

> A rule of causation which focuses solely on whether protected conduct played a part, "substantial" or otherwise, in a decision not to rehire, could place an employee in a better position as a result of the exercise of constitutionally protected conduct than he would have occupied had he done nothing. The difficulty with the rule enunciated by the District Court is that it would require reinstatement in cases where a dramatic and perhaps abrasive incident is inevitably on the minds of those responsible for the decision to rehire, and does indeed play a part in that decision—even if the same decision would have been reached had the incident not occurred. The constitutional principle at stake is sufficiently vindicated if such an employee is placed in no worse a position than if he had not engaged in the conduct. A borderline or marginal candidate should not have the employment question resolved against him because of constitutionally protected conduct. But that same candidate ought not to be able, by engaging in such conduct, to prevent his employer from assessing his performance record and reaching a decision not to rehire on the basis of that record, simply because the protected conduct makes the employer more certain of the correctness of its decision.

429 U.S. at 285-86, 97 S.Ct. at 575, 50 L.Ed.2d at 482-83. This analysis, in our view, makes clear that the Supreme Court did not intend an employee who engages in protected activity to be immune from discipline or discharge arising out of unprotected activity or work performance. In an action under OSHANC the Commissioner stands in the employee's stead.

Evaluated in light of this analysis, the undisputed facts in the case at bar would permit the court to conclude as a matter of law that Nettles would have been discharged notwithstanding the OSHANC complaint. The following factors support this conclusion: (i) the absence of any evidence of insidious intent on the part of the first-shift employees who reported the incidents on 19 January 1984, (ii) the lack of any connection whatever between these employees' reporting the incidents and Nettles' OSHANC complaint eight months earlier, (iii) the time lapse between the OSHANC complaint and the incidents precipitating Nettles' ter-

mination, (iv) the inability of the investigator, even after Nettles had returned to work, to find any evidence of a similar incident of equal seriousness where the employee had not been disciplined, (v) Nettles' refusal to acknowledge that the manner in which he had handled the job was not acceptable, (vi) Nettles' obvious hostile attitude toward his fellow employees who were endangered by his ineptitude or carelessness, and (vii) Nettles' average work performance in terms of his need for assistance and inability to handle the job.

These factors distinguish the case at bar from the cases relied on by plaintiff. For example in *Donovan v. Freeway Const. Co.*, 551 F. Supp. 869 (D.R.I. 1982), the complainants were issued pink slips which were dated two days prior to the date the employer claimed the complainants voluntarily quit. These slips stated the reason for termination as lack of work, but the employer had told the complainants when they reported for work that they were through and had hired replacements who reported for work that same day. The termination occurred just two days after complainants filed their complaints with OSHA.

In *Stafford Construction Company v. Stephen Smith, et al.*, 1983 O.S.H. Dec. (CCH) ¶ 26,514 (F.M.S.H.R.C. 1983), a decision pursuant to the Federal Mine Safety and Health Act, the evidence showed not only concerted effort to identify the complainants, but a direct correlation between the employee's protected activity and discharge. Witnesses testified that the president of the company issued a directive that when the individuals who complained to the Mine Safety and Health Administration were identified, they were to be terminated immediately. Moreover, the evidence demonstrated that defendant's reasons for terminating one of the complainants, reduction in force, could not be substantiated by employment records which showed that the employment levels remained constant. The other claimant was discharged ostensibly for damaging a motorgrader. This action was inconsistent with treatment of other employees who were discharged only for gross negligence. Other testimony showed the management's animus in that the company president had referred to the employee as "the SOB who is causing us a lot of trouble."

In *Donovan v. Peter Zimmer America, Inc.*, 557 F. Supp. 642 (D.S.C. 1982), the employees were fired less than a month after the complaint was filed with the State Department of Labor. They

BROOKS v. STROH BREWERY CO.

[95 N.C. App. 226 (1989)]

were fired for returning late from lunch. At the time, the company had no written rules concerning tardiness and absenteeism, and another employee who had been tardy numerous times, both before and after the complainants were terminated, was not disciplined. Even under new strict rules promulgated after the terminations, complainants would have received only a warning. The evidence also showed that the discharged employees were highly qualified and competent machinists whose work performance was excellent.

Similarly, in *Marshall v. P & Z Company, Inc.*, 1978 O.S.H. Dec. (CCH) ¶ 22,579 (D.D.C. 1978), the defendant's defense that the complainants' discharges were due to an accident was held to be a pretext. An almost identical accident occurred several weeks thereafter, but none of that crew was discharged. Moreover, there was also evidence that the superintendent had referred to complainants as troublemakers.

The direct causal connection between the protected activity and termination present in each of these cases is not evident in the case presently before the Court. This Court is not unmindful that circumstantial evidence is often the only evidence available to show retaliation against protected activity. *Donovan v. Peter Zimmer America, Inc.*, 557 F. Supp. at 651; *Marshall v. Chapel Electrical Co.*, 1980 O.S.H. Dec. (CCH) ¶ 24,157 (S.D. Ohio 1980). Nevertheless, the causal connection must be something more than speculation; otherwise, the complaining employee is clothed with immunity for future misconduct and is "better off" for having filed the complaint rather than merely being no "worse off." *Mt. Healthy City Board of Ed. v. Doyle*, 429 U.S. at 285-86, 97 S.Ct. at 575, 50 L.Ed.2d at 483.

The seriousness of Nettles' safety violations and his manifest disregard for the safety of his fellow workers demonstrated during the suspension interview are, in our view, significant considerations in determining that defendant as a matter of law has met its burden of showing that it would have discharged Nettles even in the absence of his complaint to OSHD. Accordingly, we hold that on the undisputed facts in the record, defendant is entitled to summary judgment as a matter of law.

II.

[2] We turn now to examine what effect, if any, Nettles' acceptance of the determination made by the multiplant grievance

BROOKS v. STROH BREWERY CO.

[95 N.C. App. 226 (1989)]

committee has on plaintiff's action. After Nettles was terminated on 26 January 1984, he filed a grievance in accordance with the collective bargaining contract. A hearing on this grievance was denied by Don Steele. After denial of his grievance, Nettles' only recourse was appeal to a multiplant grievance committee. The multiplant grievance committee heard Nettles' complaint in February 1984 and reduced the termination to a six-month suspension without pay. Under the terms of this decision Nettles returned to work at the Winston-Salem Stroh plant in July 1984.

Plaintiff contends that defendant is not entitled to summary judgment on the grounds that this action is barred by Nettles' accepting the six-month suspension in lieu of permanent discharge. Plaintiff argues that since this is a suit brought by the Commissioner of Labor to enforce a public right, the right of all employees to a safe and healthful working environment, the Commissioner should not be barred from bringing suit to enforce OSHANC's prohibition against retaliatory discharge merely because the employee pursued remedies available to him under a collective bargaining agreement.

The majority of federal courts addressing the issue have held that prior arbitration awards do not preclude the Secretary of Labor from bringing suit pursuant to 29 U.S.C. § 660(c)(1). *See, e.g., Marshall v. N.L. Industries, Inc.*, 618 F.2d 1220 (7th Cir. 1980) and *Brenan v. Alan Wood Steel Co.*, 1975-76 O.S.H. Dec. (CCH) ¶ 20,136 (E.D. Pa. 1975). Relying primarily on *Alexander v. Gardner-Denver*, 415 U.S. 36, 94 S.Ct. 1011, 39 L.Ed.2d 147 (1974), these courts have reasoned that the Secretary is asserting a statutory right independent of the arbitration process, that occupational safety and health legislation was intended to have a broad social, public policy impact that can only be satisfied in the judicial forum and that the enforcement of 29 U.S.C. § 660(c) is to benefit the public, not just individual employees. *Marshall v. N.L. Industries, Inc.*, 618 F.2d at 1222-23. The scope of relief available in arbitration does not satisfy these goals. *Id.* at 1223.

Some federal courts, however, have declined to accept the idea that the antidiscrimination enforcement provision contained in 29 U.S.C. § 660(c) has broad public interest impact in all cases. *See Marshall v. General Motors Corp.*, 1978 O.S.H. Dec. (CCH) ¶ 22,532 (N.D. Ohio 1977). *See also Donovan v. Diplomat Envelope Corp.*, 587 F. Supp. at 1420.

## BROOKS v. STROH BREWERY CO.

[95 N.C. App. 226 (1989)]

In *Alexander v. Gardner-Denver, supra,* the Court held that arbitration under the antidiscrimination provision in a collective bargaining agreement would not preclude plaintiff's statutory right of action pursuant to Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e *et seq.* 415 U.S. at 59-60, 94 S.Ct. at 1025, 39 L.Ed.2d at 164-65. Plaintiff's action in *Alexander,* however, was not pursuant to the retaliatory discharge provision of Title VII, 42 U.S.C. § 2000e-3(a), but rather was for racial discrimination, the very conduct the Civil Rights Act of 1964 was enacted to eliminate. While 29 U.S.C. § 660(c) and G.S. 95-130(8) are statutory actions apart from any collective bargaining agreement, they are retaliatory discharge provisions, not the enforcement provisions directed at the substantive ill to be corrected by OSHA and OSHANC, namely, unsafe or unhealthy conditions in the workplace. This distinction, in our view, makes the underlying public policy argument against the preclusive effect of arbitration espoused in *Alexander* less persuasive in the antiretaliation context. Moreover, the Secretary of Labor's regulations applicable to 29 U.S.C. § 660(c), 29 C.F.R. § 1977.18(a)(3), adopting a policy of deferring to an arbitration award where possible, supports the position that enforcement under the federal statute is more individual than public in nature. Furthermore, some federal courts even after *Alexander v. Gardner-Denver* recognized that the acceptance of an arbitration award and settlement with the employer would preclude a claimant from proceeding against the employer for further benefits. In *EEOC v. McLean Trucking Co.,* 525 F.2d 1007 (6th Cir. 1975), the Court stated:

> *Gardner-Denver* did not hold that a grievant may accept an award of an arbitrator and settle with his employer, and thereafter sue his employer for additional benefits.

*Id.* at 1010.

In this State, G.S. 95-36.8 provides that arbitration awards pursuant to a collective bargaining agreement provision for arbitration to settle controversies shall be final and binding upon the parties to the proceeding. Relying on *Shreve v. Duke Power Co.,* 85 N.C. App. 253, 354 S.E.2d 357 (1987), wherein an action for wrongful termination by an employee following arbitration was barred by the statute, defendant argues that plaintiff is barred in the present case. Plaintiff argues that this statute has no applicability to this proceeding because the Commissioner was not

a party to the multiplant grievance procedure and because the multiplant grievance procedure was not final and binding arbitration. We agree with plaintiff that the multiplant grievance procedure was not arbitration contemplated by G.S. 95-36.8. Thus, the statute does not bar the Commissioner's action.

The question remains, however, whether Nettles' acceptance of the multiplant grievance committee decision rendered pursuant to the collective bargaining agreement bars this action. In our view, it does.

The limited scope of the benefits sought, namely back pay for the period during Nettles' suspension, makes this action one for private rather than public benefits. *See Marshall v. General Motors, supra.* No industry or company-wide relief from a pervasive discriminatory practice is being sought in this litigation; nor is any unsafe condition subjecting other employees to potential harm to be eliminated. Hence, the public policy supporting early resolution of controversies in the workplace to promote industrial peace outweighs any public interest reason for not according the multiplant grievance decision preclusive effect. The fact that the multiplant grievance proceeding was not arbitration does not alter the result. Under the collective bargaining agreement, the multiplant proceeding, held in Tampa, Florida, was an interim step in the grievance process. The committee consisted of six people, three from the company and three from the union. If this committee deadlocked, then the grievance went to full arbitration, but if the multiplant committee was able to render a decision, that decision was final and binding. As we noted earlier, the purpose of the antiretaliation statute is to avoid the chilling effect on employees' willingness to file complaints when those who do are disciplined or discharged under pretext. In our view, this chilling effect can be neutralized effectively by a collective bargaining agreement grievance procedure. Whether in a grievance proceeding or a judicial forum, the employer is at risk of having to reduce the penalty or reinstate the employee with or without back pay. Therefore, when the scope of the relief sought by the Commissioner is for private, individual benefit, we see no reason for the action not to be barred by the employee's acceptance of an award in the collective bargaining grievance process. Accordingly, we hold that summary judgment on this ground was proper.

## III.

[3] We now address plaintiff's contention that the trial court erred in granting summary judgment for defendant on the grounds that plaintiff was collaterally estopped by virtue of Nettles' claim before the North Carolina Employment Security Commission (ESC), which found that he was dismissed for misconduct. Plaintiff argues, first, that retaliatory discharge was never considered by the ESC and, second, that the Commissioner should not be precluded from maintaining this action even if Nettles would be collaterally estopped by the Commission's findings.

After his discharge, Nettles filed a claim for unemployment compensation on 10 February 1984, stating only that he had been discharged for failing to follow company lock-out procedures. The claims adjudicator determined that since Nettles had been discharged for failing to follow posted safety procedures he had been terminated for "misconduct" and was not eligible for unemployment benefits. On 1 March 1984 Nettles appealed the decision of the claims adjudicator, raising the issue that the company was aware of his OSHANC complaint at the time he was terminated. Nettles' testimony at this hearing before the appeals referee was directed to the lock-out procedure and the events which immediately preceded his termination. Based on this testimony and a written statement from Don Steele, the referee concluded that the claimant's violation of the lock-out procedure evinced a willful disregard of the employer's best interests, that claimant was discharged from his job for misconduct, and that claimant was, therefore, disqualified from receiving unemployment benefits. Nettles appealed the decision of the referee to the full Commission. In his letter of appeal Nettles once again referred to his suspicion that his discharge was connected to his OSHANC complaint. Before the Commission reviewed the determination, it informed Nettles that he could request a hearing for oral argument on points of law but that no evidence would be taken. On 11 May 1984 the full Commission affirmed and adopted the decision rendered by the appeals referee. Finally, Nettles appealed the decision of the full Commission to Superior Court, Davie County. Nettles appeared *pro se* until the appeal to Superior Court. After a hearing, the Court held that the evidence contained in the record of proceedings before the ESC supported the ESC determination.

The transcripts and documents related to all of these proceedings have been made part of the record on appeal in this

Court. Having reviewed the transcripts and other documents connected with Nettles' ESC case, we are of the opinion that the ESC determination does not collaterally estop the Commissioner from bringing this suit against defendant for retaliatory discrimination.

Collateral estoppel is a doctrine whereby "a final judgment on the merits prevents relitigation of issues actually litigated and necessary to the outcome of the prior action in a later suit involving a different cause of action between the parties or their privies." *Thomas M. McInnis & Assoc., Inc. v. Hall*, 318 N.C. 421, 428, 349 S.E.2d 552-557 (1986). The North Carolina Supreme Court has set forth five prerequisites to the defensive use of collateral estoppel:

(i) the prior suit resulted in judgment on the merits;

(ii) identical issues are involved;

(iii) the issue was actually litigated;

(iv) the issue was actually determined;

(v) the determination was necessary to the resulting judgment.

*Id.* at 429, 349 S.E.2d at 557. In the present case, although the issue of discriminatory treatment was raised in Nettles' letters of appeal to the appeals referee and the full Commission, the record shows that no evidence was presented on this issue and neither the ESC nor the Superior Court determined whether defendant had discriminated against Nettles. In fact there is no indication that the appeals referee even considered the question of retaliatory discharge.

In *Donovan v. Diplomat Envelope Corp.*, 587 F. Supp. 1417 (E.D.N.Y. 1984), *aff'd*, 760 F.2d 253 (2d Cir. 1985), an employee was discharged after he filed complaints with his union about fumes from a faulty gas heater. The employee filed a claim for State Unemployment Insurance benefits. The administrative law judge ruled that the employee was ineligible because he walked off the job. Subsequent to the adjudication of unemployment benefits, the United States Secretary of Labor brought an action against the employer for retaliatory discrimination in violation of 29 U.S.C. § 660(c). The employer moved for summary judgment on the basis that the Secretary was collaterally estopped from claiming retaliatory discharge where the State Unemployment Insurance Agency had determined that the employee was discharged for walking off the

job. In denying the employer's motion for summary judgment, the court held that although by virtue of the agency's determination the Secretary would be collaterally estopped to deny that the employee was discharged for walking off the job, the agency's determination did not bar the Secretary's action for retaliatory discrimination because the agency determination was not dispositive of that question. *Id.* at 1421-22. Specifically, the court held that the agency's determination was unclear as to whether the discharge would have taken place in the absence of a discriminatory motive. *Id.* at 1422. *See also University of Tennessee v. Elliott*, 478 U.S. 788, 106 S.Ct. 3220, 92 L.Ed.2d 635 (1986).

On the record before this Court on this appeal, summary judgment on the basis of collateral estoppel would not be proper.

Any one of the grounds asserted by defendant would be determinative of the summary judgment, and we have ruled that defendant would be entitled to summary judgment on two of those grounds. Accordingly, the judgment of the trial court is

Affirmed.

Judges BECTON and ORR concur.